NATIONAL LABOR RELATIONS BOARD *v.* FINAN-
CIAL INSTITUTION EMPLOYEES OF AMERICA,
LOCAL 1182, CHARTERED BY UNITED FOOD
& COMMERCIAL WORKERS INTERNATIONAL
UNION, AFL–CIO, ET AL.

No. 84–1493.   Argued December 4, 1985—Decided February 26, 1986*

---

*Together with No. 84–1509, *Seattle-First National Bank* v. *Financial
Institution Employees of America, Local 1182, Chartered by United Food*

Brennan, J., delivered the opinion of the Court, in which White, Marshall, Blackmun, Powell, Rehnquist, Stevens, and O'Connor, JJ.,

& Commercial Workers International Union, AFL–CIO, et al., also on certiorari to the same court.

joined. BURGER, C. J., filed an opinion concurring in the judgment, *post,* p. 210.

*Norton J. Come* argued the cause for petitioner in No. 84–1493. With him on the briefs were *Solicitor General Fried, Linda Sher,* and *Patrick J. Szymanski.*

*Mark A. Hutcheson* argued the cause for petitioner in No. 84–1509. With him on the briefs was *Stephen M. Rummage.*

*Laurence Gold* argued the cause for respondents in both cases. With him on the brief were *George Murphy, Marsha S. Berzon, Michael Rubin,* and *David Silberman.*†

JUSTICE BRENNAN delivered the opinion of the Court.

The question for decision in these cases is whether a rule of the National Labor Relations Board that requires that non-union employees be permitted to vote in a certified union's decision whether to affiliate with another union is consistent with the National Labor Relations Act.

I

In 1970, the Board certified the Firstbank Independent Employees Association (Firstbank) as the collective-bargaining representative of a bargaining unit consisting of the employees of petitioner Seattle-First National Bank (SeaFirst). Firstbank and SeaFirst subsequently negotiated successive collective-bargaining agreements, the most recent of which expired in 1977. In 1978, Firstbank voted to affiliate with the Retail Clerks International Union, AFL–CIO. Under Firstbank's constitution, only union members in good standing could vote in the election. The union members voted in

---

†Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *Edward B. Miller* and *Stephen A. Bokat;* for the National Right to Work Legal Defense Foundation by *Raymond J. LaJeunesse, Jr.;* and for the Legal Foundation of America by *Jean Fleming Powers* and *David Crump.*

favor of affiliation by a margin of 1,206–774. Upon affiliation, Firstbank changed its name to the Financial Institution Employees of America, Local 1182 (FIEA), chartered by the Retail Clerks International Union, AFL–CIO. FIEA then petitioned the Board to amend its certification to reflect this change. SeaFirst challenged the petition, arguing that affiliation with the Retail Clerks had substantially changed the union, that nonunion employees should have been allowed to vote on whether to affiliate, and that the union had not followed its own constitution in establishing voter eligibility standards. The Board rejected these arguments and amended Firstbank's certification to name FIEA as the employees' bargaining representative. *Seattle-First National Bank*, 241 N. L. R. B. 751 (1979).[1]

SeaFirst refused to recognize the amended certification or to bargain with FIEA. The Board sustained FIEA's charges and held that SeaFirst had committed an unfair labor practice in violation of §§ 8(a)(1) and 8(a)(5) of the Act, 29 U. S. C. §§ 158(a)(1) and 158(a)(5), and ordered it to bargain.[2] *Seattle-First National Bank*, 245 N. L. R. B. 700 (1979). SeaFirst petitioned the Court of Appeals for the Ninth Circuit for review of the Board's order, and the Board cross-applied for enforcement. Before the Court of Appeals

---

[1] After the Board amended FIEA's certification, the Retail Clerks International Union merged with the Amalgamated Meat Cutters and Butcher Workmen of North America to become the United Food and Commercial Workers International Union, AFL–CIO. The Board granted FIEA's motion to amend the name of the charging party in this case to reflect this change. *Seattle-First National Bank*, 245 N. L. R. B. 700, 700, n. 1 (1979).

[2] Under § 8(a) of the Act, as set forth in 29 U. S. C. § 158(a), "[i]t shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

.          .          .          .          .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

rendered its decision, the Board moved for remand of the case to it, and the court granted the motion. *Seattle-First National Bank* v. *NLRB*, Nos. 79–7515, 80–7004 (June 27, 1980); see n. 4, *infra*.

On remand, the Board notified the parties of its decision on its own motion to reconsider its earlier decision. On reconsideration, the Board held that, because nonunion employees were not allowed to vote in the affiliation election, the election did not meet minimal "due process" standards, and therefore that the affiliation was invalid. Accordingly, the Board dismissed FIEA's unfair labor practice charge and vacated the amended certification. *Seattle-First National Bank*, 265 N. L. R. B. 426 (1982).

FIEA petitioned the Court of Appeals for the Ninth Circuit for review of the Board's decision. The Court of Appeals, in a 2–1 decision, granted the petition and remanded the case. 752 F. 2d 356 (1984). The court held that the Board's requirement that nonunion employees be allowed to vote on affiliation questions was irrational and inconsistent with the Act for three reasons. First, the Board's rule intruded upon the union's internal affairs—here a totally unjustified intrusion because the Board had not determined that affiliation had substantially changed the union or eroded its majority support—and violated the "longstanding federal labor policy of avoiding unnecessary interference in internal union affairs." *Id.*, at 362. Second, the Board's rule was "inconsistent with the strong national policy of maintaining stability in the bargaining representative." *Id.*, at 364. Pursuant to that policy, Congress and the Board had restricted the opportunities for employers and employees to challenge a certified union's status as bargaining representative,[3] and the Board's new rule did not further but breached

---

[3] The court cited three examples of Board rules designed to maintain stable bargaining relationships. 752 F. 2d, at 365. First, in cases in which the employer is charged with refusing to bargain with a certified union, the union enjoys a presumption of majority status. For the first

the policy, since it effectively decertified the union without a Board determination that affiliation had undermined the union's majority support. Finally, the Board's rule was irrational, because the interests of nonunion employees were adequately protected under existing procedures, and because the Board's reasoning did not support the rule.

The holding of the Court of Appeals conflicts with contrary holdings of the Courts of Appeals for the Fifth and Seventh Circuits upholding the Board's rule. *Local Union No. 4–14* v. *NLRB*, 721 F. 2d 150, 152–153 (CA5 1983); *United Retail Workers Union, Local 881* v. *NLRB*, 774 F. 2d 752 (CA7 1985).[4] We granted both petitions in this case to to resolve the conflict. 471 U. S. 1098 (1985). We affirm.

---

year after certification, this presumption is irrebuttable. See *Brooks* v. *NLRB*, 348 U. S. 96, 103 (1954). Second, the Board will consider "decertifying" a union only if at least 30% of the employees present a petition, or in "extreme cases." See 29 CFR § 101.18 (1985); R. Gorman, Basic Text on Labor Law 49–50 (1976). Third, under its contract-bar rule, the Board ordinarily refuses to conduct decertification elections for a certain period of time while the collective-bargaining agreement remains in effect. See 1 C. Morris, The Developing Labor Law 361–376 (2d ed. 1983).

[4] The procedural history of the Fifth Circuit's decision is closely intertwined with this case. In that case, the employer refused to bargain with an affiliated union because only union members had been allowed to vote on affiliation. The Board ordered the employer to bargain. *Amoco Production Co.*, 220 N. L. R. B. 861 (1975), aff'd, 239 N. L. R. B. 1195 (1979). The Board relied on its *Amoco* decision when it originally amended FIEA's certification in this case. *Amoco* was then appealed to the Court of Appeals for the Fifth Circuit, which remanded the case for the Board to determine whether affiliation had substantially changed the union. *Amoco Production Co.* v. *NLRB*, 613 F. 2d 107, 112 (1980). In light of the strong similarity between the two cases, the Board asked the Ninth Circuit to remand this case as well. On remand from the Fifth Circuit, the Board did not address whether affiliation had substantially changed the union. Rather, the Board reversed itself and concluded that the affiliation was invalid because only union members had been allowed to vote. *Amoco Production Co.*, 262 N. L. R. B. 1240 (1982). The Board in turn relied on this decision in dismissing FIEA's unfair labor practice charge and revoking its amended certification.

## II

Section 7 of the Act guarantees employees the right "to bargain collectively through representatives of their own choosing," 29 U. S. C. § 157, and the Board is empowered to determine representation on petition of employees or the employer. 29 U. S. C. §§ 159(c)(1)(A)(i), 159(c)(1)(B). In either case, the Board investigates the petition and holds a hearing if it has reasonable cause to believe that a "question of representation" exists, 29 U. S. C. § 159(c), and directs a representation election by secret ballot to settle the question. *Ibid.* The Board certifies the winning union as the bargaining representative of all of the employees in the bargaining unit. The employer commits an unfair labor practice by refusing to bargain with the employees' certified bargaining representative. 29 U. S. C. § 158(a)(5).

The Act recognizes that employee support for a certified bargaining representative may be eroded by changed circumstances. In such cases, employees may petition the Board for another election, alleging that the certified representative no longer enjoys majority support. 29 U. S. C. § 159(c)(1) (A)(ii); 29 CFR §§ 101.17, 102.60(a) (1985). Similarly, an employer who questions whether a majority of employees continue to support a certified union may petition for another election. 29 U. S. C. § 159(c)(1)(B); 29 CFR §§ 101.17, 102.60(a) (1985); see 1 C. Morris, The Developing Labor Law 349 (2d ed. 1983). The employer, however, must "demonstrate by objective considerations that it has some reasonable grounds for believing that the union has lost its majority status." *United States Gypsum Co.,* 157 N. L. R. B. 652, 656 (1966); 29 CFR § 101.17 (1985); see 1 Morris, *supra.* Again, if the Board determines, after investigation and hearing, that a question of representation exists, it directs an election by secret ballot and certifies the result. 29 U. S. C. § 159(c).

One such change in circumstances is, as here, where an independent union decides to affiliate with a national or inter-

national organization.[5]   In many such cases, the union may also change its name to reflect its new affiliation, and will petition the Board to amend its certification to reflect this name change.   29 CFR §§ 101.17, 102.60(b) (1985).   The Board's practice has been to grant such petitions if the Board found that the affiliation satisfied two conditions.   First, that union members have had an adequate opportunity to vote on affiliation.   *North Electric Co.*, 165 N. L. R. B. 942, 943 (1967).   The Board ordinarily required that the affiliation election be conducted with adequate "due process" safeguards, including notice of the election to all members, an adequate opportunity for members to discuss the election, and reasonable precautions to maintain ballot secrecy.   *E. g.*, *Newspapers Inc.*, 210 N. L. R. B. 8, 9 (1974), enf'd, 515 F. 2d 334 (CA5 1975).[6]   Second, that there was substantial "continuity" between the pre- and post-affiliation union. The focus of this inquiry was whether the affiliation had substantially changed the union; the Board considered such factors as whether the union retained local autonomy and local officers, and continued to follow established procedures.

---

[5] A local union may seek to affiliate with a larger organization for a variety of reasons.   The larger organization may provide bargaining expertise or financial support, or may compensate for a lack of leadership within the local union.   *Amoco Production Co.*, 239 N. L. R. B., at 1195; Hale, Union Affiliations: Examination of Governing NLRA Standards, 1983 Det. C. L. Rev. 709.   Affiliation "is but one of many ways in which labor organizations alter their structures and alignments in response to changing economic and political conditions."   Note, Union Affiliations and Collective Bargaining, 128 U. Pa. L. Rev. 430, 431 (1979).   The Board has recognized that a union "must remain largely unfettered in its organizational quest for financial stability and aid in the negotiating process."   *The Williamson Co.*, 244 N. L. R. B. 953, 955 (1979).

[6] The union suggests that it may even be inappropriate for the Board to impose due process safeguards with respect to union members.   Brief for FIEA 28–29.   While we note that the NLRA does not require unions to follow specified procedures in deciding matters such as affiliations, we need not assess the propriety of the Board's past procedures.

See Note, *supra* n. 5, at 445, and nn. 74–82.[7] If the organizational changes accompanying affiliation were substantial enough to create a different entity, the affiliation raised a "question concerning representation" which could only be resolved through the Board's election procedure. 1 Morris, *supra*, at 690; 29 CFR §§ 101.17, 102.60(b) (1985). However, as long as continuity of representation and due process were satisfied, affiliation was considered an internal matter that did not affect the union's status as the employees' bargaining representative, and the employer was obligated to continue bargaining with the reorganized union. 1 Morris, *supra*, at 690–691; *Universal Tool & Stamping Co.*, 182 N. L. R. B. 254, 259 (1970).[8]

The Board's new rule dramatically changes this scheme.[9] The Board now takes the position that all employees in the

---

[7] The parties disagree over whether affiliation substantially changed the union in this case. See Brief for NLRB 4, and n. 2; Brief for FIEA 4. However, the Board did not make a continuity determination but simply dismissed FIEA's unfair labor practice charge and vacated its amended certification. The Court of Appeals therefore declined to address the continuity issue. 752 F. 2d, 356, 359, n. 4 (1984). We also decline to address it.

[8] In some cases, the affiliated union will not petition the Board to amend its certification, but will instead wait to see whether the employer will continue to bargain. If the employer refuses to bargain, the union may then file an unfair labor practice charge with the Board. In the past, the Board required the employer to bargain if the affiliation satisfied its two-pronged due process and continuity test. In other words, the Board used the same standards to examine affiliations whether the issue arose as a defense to an unfair labor practice charge or in a petition to amend a certification. *Independent Drug Store Owners of Santa Clara County*, 211 N. L. R. B. 701, n. 2 (1974), enf'd, 528 F. 2d 1225 (CA9 1975); Hale, *supra* n. 5, at 710, and n. 8; Note, *supra* n. 5, at 432.

[9] The Board's assertion that it actually adopted its "new" rule in its decision in *Jasper Seating Co.*, 231 N. L. R. B. 1025 (1977), may be questioned. *Jasper* was a 3–2 decision in which only two members took the position that nonunion employees should be allowed to vote in affiliation elections. While suggesting that he could adopt this position under other circumstances, member Penello concurred in the decision "based upon the

bargaining unit—not merely union members—must have the opportunity to participate in the affiliation decision. See *Amoco Production Co.*, 262 N. L. R. B. 1240, 1241 (1982). Unless they are allowed to do so, the Board will not amend the union's certification or require the employer to bargain with the reorganized union. The Board applies this rule even though the organizational changes resulting from the affiliation are not substantial enough to raise a question of representation. See Brief for NLRB 16–17. The Board does not contend that the Act requires that all employees of the bargaining unit, union and nonunion, must be allowed to participate in the affiliation election or that the Act expressly authorizes the Board to impose such requirements. Rather, the Board and the employer defend the Board's new rule on two grounds. First, they assert that the Board's rule is a reasonable means of protecting the bargaining unit employees' right to select a bargaining representative under § 7 of the Act. Second, they argue that the rule minimizes industrial strife. We address each argument in turn.

## III

### A

Petitioners argue that the Board should be afforded "a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees," *NLRB* v. *A. J. Tower Co.*, 329 U. S. 324, 330 (1946); see also 29 U. S. C. § 156; *NLRB* v. *Wyman-Gordon Co.*, 394 U. S. 759, 767 (1969); *NLRB* v. *Waterman S.S. Corp.* 309 U. S. 206, 226 (1940), and contend that a requirement that all employees be allowed to vote on affiliation is a reasonable means of insuring that a majority of employees consent to representation by the postaffiliation union, and ultimately of protecting the right of

application of [different] principles." *Id.*, at 1026. He found that the affiliation had raised a question of representation which could only be resolved through a Board-conducted representation election. *Id.*, at 1027.

all employees to select a bargaining representative. Our cases have previously recognized the Board's broad authority to construe provisions of the Act, and have deferred to Board decisions that are not irrational or inconsistent with the Act. *Ford Motor Co.* v. *NLRB*, 441 U. S. 488, 495, 497 (1979); *Beth Israel Hospital* v. *NLRB*, 437 U. S. 483, 501 (1978); *NLRB* v. *Iron Workers*, 434 U. S. 335, 350 (1978). However, the question here is whether the Board's new rule exceeds the Board's statutory authority. Cf. *NLRB* v. *Longshoremen*, 473 U. S. 61 (1985); *NLRB* v. *Bildisco & Bildisco*, 465 U. S. 513 (1984). Deference to the Board "cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption . . . of major policy decisions properly made by Congress." *American Ship Building Co.* v. *NLRB*, 380 U. S. 300, 318 (1965); see also *NLRB* v. *Insurance Agents*, 361 U. S. 477, 499 (1960). We hold that the Board's new rule exceeds its authority under the Act.

Under the Act, the certified union must be recognized as the exclusive bargaining representative of all employees in the bargaining unit, and the Board cannot discontinue that recognition without determining that the affiliation raises a question of representation and, if so, conducting an election to decide whether the certified union still is the choice of a majority of the unit. 29 U. S. C. § 159(c). Of course, as is the case with any organizational and structural change, a new affiliation may substantially change a certified union's relationship with the employees it represents. These changed circumstances may in turn raise a "question of representation," if it is unclear whether a majority of employees continue to support the reorganized union. Thus, in these situations, the affiliation implicates the employees' right to select a bargaining representative, and to protect the employees' interests, the situation may require that the Board exercise its authority to conduct a representation election. 29 U. S. C. § 159(c)(1). However, the Board's decision must take into account that "[t]he industrial stability sought by the

Act would unnecessarily be disrupted if every union organizational adjustment were to result in displacement of the employer-bargaining representative relationship." *Canton Sign Co.*, 174 N. L. R. B. 906, 909 (1969), enf. denied on other grounds, 457 F. 2d 832 (CA6 1972). In many cases, a majority of employees will continue to support the union despite any changes precipitated by affiliation.[10] In such situations, affiliation does not necessarily implicate the "selection" of a new bargaining representative. The reorganized union may legitimately claim to succeed as the employees' duly selected bargaining representative, and in that case retains a legitimate interest in continuing to bargain collectively with the employer. The Act balances these competing concerns by authorizing the Board to conduct a representation election *only* where affiliation raises a question of representation. 29 U. S. C. § 159(c). Conversely, where affiliation does not raise a question of representation, the statute gives the Board no authority to act. The Board's new rule upsets the accommodation drawn by the statute by effectively decertifying the reorganized union even where affiliation does not raise a question of representation.

Turning to the record in these cases, the Board revoked FIEA's certification and relieved SeaFirst of its obligation to bargain despite the fact, as the Board acknowledges, that it was not sufficient to raise a question of representation that nonunion employees were not allowed to vote in the affiliation election. Brief for NLRB 16–17. Absent a question of

---

[10] The Board has recognized that "affiliation does not directly involve the employment relation. The status of wages, working conditions, benefits, and grievance procedures is unaffected by the affiliation vote; the collective-bargaining agreement between the union and the employer remains effective until the stated expiration date." *Amoco Production Co.*, 239 N. L. R. B., at 1195. Affiliation "has no probative value concerning the employees' choice of the [union] as their collective bargaining representative." *American Range Lines, Inc.*, 13 N. L. R. B. 139, 154 (1939); see also Brief for NLRB 16, n. 10 ("The Board has in general found that affiliations do not destroy continuity of representation").

representation, FIEA continued to function, as it was enti-
tled to do, as the bargaining representative of the unit, and
SeaFirst was obligated to continue bargaining with it. By
refusing either to amend FIEA's certification or to order
SeaFirst to bargain, the Board effectively circumvented the
decertification procedures provided for by statute. More-
over, the Board exceeded its statutory authority by requiring
that nonunion employees be allowed to vote in the union's
affiliation election. This violated the policy Congress incor-
porated into the Act against outside interference in union
decisionmaking. See *Steelworkers* v. *Sadlowski*, 457 U. S.
102, 117 (1982); *NLRB* v. *Boeing Co.*, 412 U. S. 67, 71 (1973);
*Scofield* v. *NLRB*, 394 U. S. 423, 428 (1969); *NLRB* v. *Allis-
Chalmers Mfg. Co.*, 388 U. S. 175, 195 (1967). Petitioners
maintain that this policy must give way to the right of the
employees to select a bargaining representative. Cf. *Pat-
tern Makers* v. *NLRB*, 473 U. S. 95 (1985) (union rule bar-
ring resignations during a strike contrary to statutory policy
of voluntary unionism); *NLRB* v. *Marine Workers*, 391 U. S.
418 (1968) (union rule requiring exhaustion of internal griev-
ance procedures does not preclude Board review). But the
Act establishes a specific election procedure to decide
whether the employees desire a change in a certified union's
representative status. While the Board is charged with
responsibility to administer this procedure, the Act gives the
Board no authority to require unions to follow other proce-
dures in adopting organizational changes.[11]

---

[11] Congress has expressly declined to prescribe procedures for union
decisionmaking in matters such as affiliation. When the NLRA was
amended by the Labor Management Relations Act of 1947, the House
passed a proposal that would have regulated union procedures for electing
officers, assessing dues, disciplining members, and deciding to strike.
H. R. 3020, § 8(c), 80th Cong., 1st Sess. (1947), 1 NLRB, Legislative His-
tory of the Labor Management Relations Act, 1947, pp. 179–183 (Legis.
Hist.). These provisions were deleted from the final legislation. See 93
Cong. Rec. 6443 (1947), 2 Legis. Hist. 1540 ("The Senate conferees . . . felt
that it was unwise to authorize [the NLRB] to undertake such elaborate

## B

Petitioners contend that this statutory scheme does not adequately protect the interests of nonunion employees, and that this justifies the Board's new rule. They argue that an affiliation may affect a union's representation of the bargaining unit even if it does not raise a question of representation, but that argument overlooks the fact that a union makes many decisions that "affect" its representation of nonmember employees. It may decide to call a strike, ratify a collective-bargaining agreement, or select union officers and bargaining representatives. Under the Act, dissatisfied employees may petition the Board to hold a representation election, but the Board has no authority to conduct an election unless the effects complained of raise a question of representation. In any event, dissatisfaction with representation is not a reason for requiring the union to allow nonunion employees to vote on union matters like affiliation. Rather, the Act allows union members to control the shape and direction of their organization, and "[n]on-union employees have no voice in the affairs of the union." *Allis-Chalmers*, 388 U. S., at 191. We repeat, dissatisfaction with the decisions union members make may be tested by a Board-conducted representation

policing of the internal affairs of unions"). In 1959, Congress adopted the Labor-Management Reporting and Disclosure Act, which regulated union procedures for assessing dues, disciplining employees, and electing officers. 29 U. S. C. §§ 411–415, 481. Senators Knowland and McClellan both advanced proposals to regulate other sorts of union decisions. See 104 Cong. Rec. 11184 (1958) (constitutional amendments and recall of officers); *id.*, at 11461 (waiver of right to strike); S. 1137, § 102(5), 86th Cong., 1st Sess. (1959), 1 Legislative History of the Labor-Management Reporting and Disclosure Act 272–273 (1959) (creation of affiliated organizations or funds), § 103(4), *id.*, at 277 (mergers and transfers between local unions). None of these proposals was incorporated into the statute. See *Steelworkers* v. *Sadlowski*, 457 U. S. 102, 117 (1982) ("Congress was guided by the general principle that unions should be left free to 'operate their own affairs, as far as possible.' It believed that only essential standards should be imposed by legislation" (citation omitted)).

election only if it is unclear whether the reorganized union retains majority support.

Petitioners concede that a union's organizational and structural changes would not ordinarily justify the Board's meddling in a union's internal affairs, but argue that affiliation is different from other changes because affiliation necessarily changes the union's identity, and because initiation of the change is by the certified union seeking the Board's approval for the affiliation by amendment of its certification or an order on the employer to bargain after affiliation. Neither distinction is persuasive.

First, petitioners argue that affiliation differs from other organizational changes because it results in employees being represented by a different organization. See *Hamilton Tool Co.*, 190 N. L. R. B. 571, 576 (1971) (Miller, concurring). But many organizational or structural changes may operate to alter a union's "identity." This would be the case where the union amends its constitution or bylaws, restructures its financial obligations and resources, or alters its jurisdiction. The fact that an affiliation is often accompanied by a formal name change does not serve to distinguish it from other organizational developments. As the Board has recognized, "an affiliation does not create a new organization, nor does it result in the dissolution of an already existing organization." *Amoco Production Co.*, 239 N. L. R. B. 1195 (1979). Rather, the union will determine "whether any administrative or organizational changes are necessary in the affiliating organization." *Ibid.* If these changes are sufficiently dramatic to alter the union's identity, affiliation may raise a question of representation, and the Board may then conduct a representation election. Otherwise, the statute gives the Board no authority to interfere in the union's affairs.

Petitioners next contend that affiliation involves the union's asking the Board to amend its certification or to order

the employer to bargain.[12]  Petitioners assert that the Board therefore has a strong interest in insuring that its own election procedures have not been circumvented before placing its imprimatur on the union's affiliation election.  This argument mischaracterizes the nature of the relevant procedures. In amending the union's certification or ordering the employer to bargain, the Board does not "sanction" the union's affiliation.  Rather, it signifies only that the reorganized union continues as an ongoing entity that the employer should continue to recognize.  By analogy, the fact that the Board may order the employer to bargain with a union that has amended its constitution does not mean that the Board has "sanctioned" the constitutional amendment.  In any event, the Board's interest in insuring the integrity of its procedures does not empower it to adopt measures exceeding its statutory authority.  If the Board finds that affiliation raises a question of representation "undermining . . . the Board's own election and certification procedures," *Amoco Production Co.*, 262 N. L. R. B., at 1241, it can refuse to consider the union's unfair labor practice charge, and is authorized to conduct a representation election.  However, it may not condone an employer's refusal to bargain in the absence of a question of representation, and has no authority to

---

[12] In its *amicus* brief, the Chamber of Commerce notes that the statute does not explicitly provide for petitions to amend a union's certification, and argues that the Board therefore has broad authority to refuse to grant such requests.  However, because the union's request to amend its certification is a mere formality, it cannot give the Board additional authority to police the affiliation.  A union could simply decide not to change its name upon affiliation, and would not have to ask the Board to amend its certification.  The employer might then challenge the affiliation as a defense to an unfair labor practice charge.  Unless the Board finds that the affiliation raised a question of representation, the affiliated union would continue as the employees' bargaining representative, and the employer would be required to bargain with the reorganized union.  Thus, the amended certification procedure cannot broaden the Board's authority to interfere in the union's affairs.

prescribe internal procedures for the union to follow in order to invoke the Act's protections.

## IV

The basic purpose of the National Labor Relations Act is to preserve industrial peace. 29 U. S. C. § 151. The Act includes several provisions designed to encourage stable bargaining relationships, e. g., § 8(b)(7)(A), 29 U. S. C. § 158 (b)(7)(A) (prohibiting recognitional picketing by employees represented by recognized union); § 8(b)(7)(B), 29 U. S. C. § 158(b)(7)(B) (prohibiting recognitional picketing for one year after election); § 9(c)(3), 29 U. S. C. § 159(c)(3) (prohibiting second representation election within one year), and the Board has devised rules to achieve the same ends. See n. 3, supra. Petitioners argue that the Board's new rule furthers this policy by introducing a measure of certainty into the bargaining relationship that protects both the employer and the union. By having all employees vote for affiliation, so the argument goes, the employer avoids the possibility of having to bargain with a union that may not represent a majority of the employees. Petitioners submit that the union also benefits from having all employees vote, since it avoids the disruption that would occur if the Board eventually determines that it must hold a new election because the affiliation raises a question of representation. If the employees vote for affiliation, the union can continue to bargain with confidence, since the employer is less likely to challenge the affiliation, and the Board is less likely to find a question of representation. If the employees vote against affiliation, the incumbent union can forgo affiliation and continue to represent the bargaining unit.

Absent any statutory framework, the Board's rule might well be a rational means of preserving industrial stability. However, as the Ninth Circuit noted, Congress has already determined "as a matter of national labor policy that bargaining stability and the principle of majority rule may limit the timing of employee challenges to their certified bargaining

representative's majority status." 752 F. 2d, at 366. The Act assumes that stable bargaining relationships are best maintained by allowing an affiliated union to continue representing a bargaining unit unless the Board finds that the affiliation raises a question of representation. The Board's rule contravenes this assumption, since an employer may invoke a perceived procedural defect to cease bargaining even though the union succeeds the organization the employees chose, the employees have made no effort to decertify the union, and the employer presents no evidence to challenge the union's majority status. Any uncertainty on the employer's part does not relieve him of his obligation to bargain collectively. "If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief . . . . To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to [industrial peace]." *Brooks* v. *NLRB*, 348 U. S. 96, 103 (1954). The Board's rule effectively gives the employer the power to veto an independent union's decision to affiliate, thereby allowing the employer to directly interfere with union decisionmaking Congress intended to insulate from outside interference.

We hold that the Board exceeded its authority under the Act in requiring that nonunion employees be allowed to vote for affiliation before it would order the employer to bargain with the affiliated union.[13] The judgment of the Court of Appeals is affirmed. The cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[13] We do not suggest, however, that other Board representation procedures, such as its continuity determination, exceed its statutory authority.

Respondents argue that the Board's rule is irrational because it assumes that affiliation involves the selection of a new bargaining representative absent any indication that the affiliation has significantly changed the union. Because we conclude that the Board has exceeded its authority under the statute, we need not address this issue.

CHIEF JUSTICE BURGER, concurring in the judgment.

I write separately to note that the Court's action today striking down a Board action is one of those rare departures from this Court's long history of special deference to the Board's decisions concerning the selection of an exclusive bargaining unit representative by employees. See, *e. g.*, *NLRB* v. *A. J. Tower Co.*, 329 U. S. 324, 330 (1946); see also *NLRB* v. *Action Automotive, Inc.*, 469 U. S. 490 (1985).