[No. 21998–7–I. Division One. August 21, 1989.]

SKAGIT VALLEY HOSPITAL, ET AL, *Appellants,* v. PUBLIC EMPLOYMENT RELATIONS COMMISSION, ET AL, *Respondents.*

*Larry E. Halvorson, Mark W. Berry,* and *Davis Wright & Jones,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Richard A. Heath, Assistant; Lawrence Schwerin* and *Hafer, Price, Rinehart & Schwerin,* for respondents.

SWANSON, J.—Skagit Valley Hospital and Island Hospital (the "hospitals") appeal from a superior court order that affirmed a decision by the Public Employment Relations Commission (PERC). The hospitals contend that PERC erred in determining that they committed unfair labor practices.

Appellant hospitals are public hospital districts organized pursuant to RCW 70.44 and are "public employers" within the meaning of RCW 41.56.030(1). From about the early 1970's to 1985, the Licensed Practical Nurses Association of Washington State (LPNAWS) acted as the "bargaining representative" pursuant to RCW 41.56.030(3) for licensed practical nurses employed by the hospitals. In late 1984, LPNAWS, concerned about the potential loss of members to "raiding" labor organizations, began to consider affiliation with another union. In early 1985, a committee recommended to the LPNAWS executive board that LPNAWS affiliate with Local 6 of the Service Employees International Union (SEIU Local 6). In response, the LPNAWS executive board agreed to seek affiliation with SEIU Local 6 for purposes of collective bargaining.

In April 1985, members of LPNAWS were notified through the organization's newsletter that a resolution on affiliation with SEIU Local 6 would be voted on at the annual LPNAWS convention in May 1985. Delegates to the LPNAWS convention approved the affiliation resolution 70 to 3. The delegates also agreed to delete collective bargaining functions from the LPNAWS bylaws and elected several LPNAWS members to serve on various boards of SEIU Local 6. Following the convention, a ratification vote by LPNAWS members was held at 22 sites around the state during June and July 1985. Out of a statewide total of about 1,700 eligible voters, the vote was 189 to 24 in favor of affiliation.

After the ratification vote, LPNAWS and SEIU Local 6 entered into a formal "Affiliation Agreement." The agreement provided that SEIU Local 6 would, among other things, create an "LPN Division." LPNAWS was to retain its identity and autonomy, except for all rights and obligations pertaining to collective bargaining, which were vested in SEIU Local 6 and the LPN Division. SEIU Local 6 agreed to include a specified number of licensed practical nurses on its executive board, board of trustees, and on the

"LPN Division" board. Licensed practical nurses were to have dual membership in LPNAWS and SEIU Local 6.

In August 1985, representatives of SEIU Local 6 attempted to enter into collective bargaining relationships with Skagit Valley Hospital, Whidbey General Hospital, Island Hospital, and Kittitas Valley Community Hospital. The hospitals refused to recognize or negotiate with SEIU Local 6. On August 28, 1985, SEIU Local 6 filed a complaint with PERC alleging that the hospitals had engaged in unfair labor practices pursuant to RCW 41.56.140(1) and (4).[1]

After 3 days of hearings in December 1985 and January 1986, a PERC hearing examiner agreed with SEIU Local 6's complaint. The hearing examiner issued a decision on October 20, 1986, concluding that SEIU Local 6 had become the valid successor to LPNAWS' status as exclusive bargaining representative of the licensed practical nurses and that the hospitals had committed unfair labor practices within the meaning of RCW 41.56.140(1) and (4). *Service Employees Int'l Union, Local 6 v. Skagit Vly. Hosp.*, Public Empl. Relations Comm'n Dec. 2509 PECB (1986). The hospitals petitioned for review of the hearing examiner's decision by the full Commission. On June 18, 1987, the Commission affirmed, agreeing in full with the hearing examiner's decision. *Service Employees Int'l Union, Local 6 v. Skagit Vly. Hosp.*, Public Empl. Relations Comm'n Dec. 2509–A PECB (1987). Skagit Valley Hospital, Whidbey General Hospital, and Island Hospital appealed the PERC decision to Superior Court, which affirmed. Skagit Valley Hospital and Island Hospital then appealed to this court.

---

[1] RCW 41.56.140 provides in pertinent part:

"It shall be an unfair labor practice for a public employer:

"(1) To interfere with, restrain, or coerce public employees in the exercise of their rights guaranteed by this chapter;

". . . .

"(4) To refuse to engage in collective bargaining."

■■■ The administrative procedure act (APA), former RCW 34.04.130(6), governs the review of administrative actions in contested cases.

> An administrative decision will be upheld on factual determinations under the clearly erroneous standard of RCW 34.04-.130(6)(e) unless the court's review of the entire record leaves it with the definite and firm conviction that a mistake has been made. When reviewing questions of law under the error of law standard of RCW 34.04.130(6)(d), an appellate court may substitute its determination for that of the agency, although the agency's determination is entitled to substantial weight. In an appeal of an administrative decision involving a mixed question of law and fact, the court does not try the facts de novo but it determines the law independently of the agency's decision and applies it to facts as found by the agency.

(Citation omitted.) *Renton Educ. Ass'n v. Public Empl. Relations Comm'n*, 101 Wn.2d 435, 440–41, 680 P.2d 40 (1984). This court reviews only the administrative record. *Lewis Cy. v. Public Empl. Relations Comm'n*, 31 Wn. App. 853, 860, 644 P.2d 1231, *review denied*, 97 Wn.2d 1034 (1982).

The hospitals initially challenge several formal findings of fact, as well as certain narrative elaborations of these findings by both the hearing examiner and the full Commission. The thrust of the hospitals' factual challenge is that LPNAWS' affiliation with SEIU Local 6 resulted in a sufficient loss of LPNAWS' identity as the exclusive bargaining representative to destroy any "continuity" between the pre– and postaffiliation bargaining representative and to raise a question of representation, thus justifying the hospitals' refusal to bargain with the postaffiliation organization.

The hospitals first contend that the hearing examiner erred in finding that under the terms of the affiliation agreement, "LPNAWS was to retain autonomy *within* Local 6 to conduct its professional and educational functions." (Italics ours.) Finding of fact 11. The hospitals assert that LPNAWS is not "within" SEIU Local 6 because it essentially "sold" its collective bargaining functions to

SEIU Local 6 and otherwise remained autonomous. Consequently, the hospitals reason, there is no continuity between the pre– and postaffiliation bargaining representative.

Finding of fact 11, however, merely recites some of the provisions of the affiliation agreement. It does not purport to characterize qualitatively the nature of the postaffiliation LPNAWS–SEIU Local 6 relationship. The hospitals' argument therefore places undue emphasis on the term "within," which they fail to define. The affiliation agreement permitted LPNAWS to retain autonomy to conduct its professional and educational activities, one of its two major preaffiliation functions. The other major preaffiliation function of LPNAWS—collective bargaining—was transferred to SEIU Local 6. Despite LPNAWS' retention of a separate identity, its affairs are intertwined with those of SEIU Local 6. First, the preaffiliation collective bargaining activities were transferred to SEIU Local 6, with substantial involvement by former LPNAWS personnel in those functions. In addition, SEIU Local 6, under the terms of the agreement, provides various forms of moral and financial support for LPNAWS' non–collective bargaining activities. In light of these and other circumstances, the hearing examiner's characterization of LPNAWS as retaining autonomy in some areas while "within" SEIU Local 6 finds substantial support in the record.

The hospitals next challenge the Commission's narrative "finding" that "[t]he authority to accept or reject what has been negotiated has been retained by the LPN Division Members." The Commission's formulation, in turn, is based on finding of fact 13, which provided, "The local bargaining units at each respondent hospital retained control over proposing and ratifying changes in its collective bargaining agreements."[2] The hospitals contend that these findings

---

[2]The hearing examiner determined: "Each unit in the LPN division of Local 6 retains authority to determine proposed amendments to their contract. Each unit continues to select among its members those who will sit at the bargaining table

are "clearly erroneous" because, pursuant to SEIU Local 6's bylaws and constitution, the president of Local 6 ultimately signs all collective bargaining agreements and is accorded certain other powers and authority. In addition, the hospitals point to the international SEIU president's authority over contracts negotiated by local unions. The hospitals maintain that the existence of such provisions demonstrates that the LPNAWS membership effectively lost control of collective bargaining as a result of the affiliation.

The evidence before the hearing examiner established that the individual bargaining units continued to exert substantial control over the collective bargaining process following affiliation. Sharon Farrell, the LPNAWS assistant executive director, was responsible for negotiating virtually all of the preaffiliation LPNAWS agreements. Following affiliation, Ms. Farrell was retained by SEIU Local 6 as coordinator of the LPN Division and continued to service a significant number of agreements. Ms. Farrell's duties encompassed all aspects of the collective bargaining process. Ms. Farrell also exercised substantial supervisory control over the two business representatives, former LPNAWS unit chairs, hired by SEIU Local 6 to service the remaining contracts. At the hearing, Ms. Farrell stated that collective bargaining procedures were essentially the same before and after the affiliation, and that bargaining unit employees remained responsible for ratifying a proposed agreement or sanctioning a strike.

Marc Earls, president of SEIU Local 6, testified that the terms of a collective bargaining agreement were negotiated and ratified independently by the unit members of the LPN Division. Earls could not recall a situation in which Farrell's authority had ever been limited. Earls acknowledged that the international division of the SEIU retained

---

with the business representative. After negotiations are completed, the unit alone continues to decide to ratify or reject changes negotiated in the agreement. Only bargaining unit members would vote on whether to strike." Pub. Empl. Relations Comm'n 2509, at 17.

the right to refuse to sanction illegal strikes, but otherwise would sanction local actions.

■ The evidence thus demonstrated that the practical authority to negotiate and ratify contracts remained, as before, with the individual bargaining unit members. The hospitals failed to identify a single instance of SEIU interference, either by Local 6 or by the international division, in the individual bargaining unit authority of the LPN Division. The continuing autonomy of local bargaining units to negotiate and ratify contracts is not negated merely by the existence of certain rights of approval retained by SEIU Local 6 and its international division. As the NLRB has noted in a comparable context:

> These reserved rights of approval, allowing the International only to react to initiatives of the local, do not serve to supplant the local as the entity primarily responsible for the conduct of its affairs. Indeed, if such conditions were sufficient to warrant a finding that an affiliation had produced changes in the local that raised a question concerning representation, this would be tantamount to a conclusion that virtually any affiliation of a local with an International would raise such a question. We see no basis in either precedent or policy for such a rule.

*May Dep't Stores Co.*, 289 N.L.R.B. No. 88, 1987–88 N.L.R.B. Dec. (CCH) ¶ 19,490, at 23,769–70 (1988). Under these circumstances, we cannot say that the findings regarding the authority of LPNAWS members to control collective bargaining are clearly erroneous.[3]

■ The hospitals next contend that PERC erroneously failed to follow federal precedent in determining that LPNAWS' affiliation with SEIU Local 6 did not raise a

---

[3]In a related argument, the hospitals challenge the Commission's observation that the changes in union organization following affiliation did not "provide a picture of great differences." This challenge is little more than a reformulation of the hospitals' assertion that SEIU Local 6 effectively removed any collective bargaining authority from the members of LPNAWS. As already indicated, however, the findings that the individual bargaining units retained the practical control over collective bargaining agreements following affiliation were well supported by the record. Much of appellants' argument on this issue rests on the Commission's erroneous substitution of "LPN Division" for "LPNAWS" in several passages of its decision. Given the Commission's complete adoption of the hearing examiner's decision, however, these misstatements are of no legal significance here.

"question of representation." Under federal law, the National Labor Relations Board (NLRB) and the courts have recognized that organizational changes such as affiliations do not inevitably raise a "question of representation" necessitating a Board–certified election:

> So long as the changes are not sufficiently dramatic to alter the union's identity, a decision to affiliate is an internal union matter that does not affect the representative status of the bargaining agent or end the employer's duty to continue its relationship with that union. Otherwise, the Board has reasoned, "[t]he industrial stability sought by the Act would unnecessarily be disrupted if every union organizational adjustment were to result in displacement of the employer–bargaining representative relationship."

*NLRB v. Insulfab Plastics, Inc.*, 789 F.2d 961, 964–65 (1st Cir. 1986) (quoting *Canton Sign Co.*, 174 N.L.R.B. 906, 909 (1969), *enforcement denied on other grounds sub nom. NLRB v. Canton Sign Co.*, 457 F.2d 832 (6th Cir. 1972)).

In order to determine whether organizational changes require a new Board–certified election, the NLRB utilizes a 2–part test:

> First, the employees in the bargaining unit must have had a fair opportunity, with adequate due process safeguards, to approve the organizational change. Second, there must be "substantial continuity" between the pre–affiliation and the post–affiliation union.

(Citation omitted.) *NLRB v. Insulfab*, at 965. In *NLRB v. Financial Inst. Employees of Am., Local 1182*, 475 U.S. 192, 89 L. Ed. 2d 151, 106 S. Ct. 1007 (1986), (*FIEA*), the United States Supreme Court recognized the existence of the 2–part test, but expressly declined to address the "continuity" prong as the issue before it involved only due process. 475 U.S. at 200 n.7.

 The hospitals maintain that PERC committed an error of law by failing to follow the NLRB 2–part test. In particular, the hospitals contend that PERC placed an undue emphasis on the "due process" prong, while ignoring the "continuity" prong. This contention, however, rests on

the erroneous assumption that federal precedent is necessarily controlling in PERC decisions. RCW 41.56, the Public Employees' Collective Bargaining Act, is substantially similar to the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169, and decisions under the NLRA are persuasive in construing similar provisions in the state act. *International Fed'n of Professional & Technical Eng'rs, Local 17 v. State Personnel Bd.*, 47 Wn. App. 465, 476, 736 P.2d 280, *review denied*, 108 Wn.2d 1036 (1987). While decisions under the NLRA are persuasive, they are not controlling. *Green River Comm'ty College Dist. 10 v. Higher Educ. Personnel Bd.*, 107 Wn.2d 427, 730 P.2d 653 (1986). The hospitals have not identified any statutory provision, administrative rule, or other authority that would compel adherence to the federal 2–part test. In any event, the hospitals' assertion that the Commission failed to follow the 2–part test is incorrect; both the hearing examiner and the Commission determined that the federal 2–part test was satisfied here.

Under the first prong of the federal test, the union vote in favor of affiliation must accurately reflect the views of a majority of the bargaining unit employees:

> This means that the election must "be conducted with adequate 'due process' safeguards, including notice of the election to all members, an adequate opportunity for members to discuss the election, and reasonable precautions to maintain ballot secrecy."

*Insulfab*, at 965 (quoting *FIEA*). The hospitals contend that the due process prong was not satisfied here because only 224 of approximately 1,700 eligible voters took part in the affiliation election. The hospitals further suggest, as they did below, that the LPNAWS personnel in charge of the election may have manipulated the outcome because of a financial interest in affiliation, *i.e.*, because they would be hired at increased salaries by SEIU Local 6.

The hospitals' due process contentions were rejected below by the hearing examiner, who discussed at great

length the issues of notice, opportunity to discuss, and ballot secrecy. Because the hospitals have not directed any specific argument to these findings on appeal, we do not further address this issue, except to reiterate the Commission's observation that no employee had stepped forward to raise a "question of representation" and that "not a single employee, out of the 1800 employees affected, testified that the notice, discussion or balloting process were possibly flawed, or that there is any dissatisfaction with the outcome."

The NLRB has described the purpose underlying the second or "continuity" prong as follows:

> [in determining continuity,] the Board is not directly inquiring into whether there is majority support for the labor organization after the changes at issue, but rather is seeking to determine whether the changes are so great that a new organization has come into being—one that should be required to establish its status as a bargaining representative through the same means that any labor organization is required to use in the first instance. The continuity requirement thus ensures that no one can substitute an entirely different representative in disregard of the established mechanisms for making such a change.

*Western Comm'l Transp., Inc.*, 288 N.L.R.B. No. 27, 1987–88 NLRB Dec. (CCH) ¶ 19,309, at 33,359 (1988). In determining whether there has been substantial continuity of representation following an affiliation, the NLRB considers a broad range of factual circumstances, including

> continued leadership responsibilities by the existing union officials; the perpetuation of membership rights and duties, such as eligibility for membership, qualification to hold office, oversight of executive council activity, the dues/fees structure, authority to change provisions in the governing documents, the frequency of membership meetings, the continuation of the manner in which contract negotiations, administration, and grievance processing are effectuated; and the preservation of the certified union's physical facilities, books, and assets.

*Western Transp.*, at 33,359; *see also Insulfab*, at 966. Although the Commission expressed strong reservations about the validity of the continuity doctrine as applied in federal decisions, it nonetheless determined that there *was*

sufficient continuity of representation here under the federal test.

The hearing examiner found that the LPN Division provided substantial continuity of representation based on several factors: (1) the preaffiliation LPNAWS members continued to control collective bargaining through the LPN Division board of directors, which was elected by the delegates to the LPNAWS convention; (2) LPNAWS continued to maintain a substantial separate existence; (3) Ms. Farrell, as well as additional LPNAWS personnel, continued to play substantial roles in the bargaining units following affiliation; and (4) the individual bargaining units retained authority to determine proposed amendments to their contracts, to select members to sit at the bargaining table, to ratify or reject changes negotiated in the agreement, and to vote on whether to strike. Even under the federal precedent relied upon by the hospitals, the hearing examiner's conclusion was amply supported.

The findings in this case are distinguishable from the circumstances in *Western Transp.,* the primary case relied upon by the hospitals, in which the NLRB, in a 2–to–1 decision, found that affiliation had altered the "fundamental character of the representing organization" and that continuity had not been established:

> [The preaffiliation union's] autonomy will disappear, to be replaced *entirely* by District Lodge 776's control. The individuals who previously had led their fellow members and represented the unit to the Employer *will be unable to have any major role* in the direction of their organization and *will be replaced by District Lodge 776 employees who have had no previous connection with the unit.* The rights of the membership will be substantially diminished, and their numbers will represent but a small fraction of the new union's body.

(Italics ours.) *Western Transp.,* at 33,360. From this recital, it is evident that the changes in *Western Transp.* were substantially more "dramatic" than those involved here. Consequently, the Commission's determination of "continuity" is sustainable under the 2–part federal test. The weight to be given the various factors used to determine

continuity in a given case is for PERC, not the reviewing court. *Cf. Renton Educ. Ass'n,* at 444. PERC's failure to weigh the various factors in precisely the same manner as the NLRB does not constitute an error of law.

Although finding sufficient continuity under the facts here, both the hearing examiner and the Commission[4] expressed reservations about the continuity doctrine as applied at the federal level. The Commission's criticism of the continuity doctrine rests on an analysis of the competing policy concerns that are implicated in an affiliation or merger. Even if we were to assume that the Commission's criticisms constituted the legal standard that was applied in this case, as the hospitals erroneously maintain, this court, while free to substitute its own judgment on matters of law, would nonetheless give great deference to PERC's expertise in interpreting labor relations law. *Public Empl. Relations Comm'n v. Kennewick,* 99 Wn.2d 832, 842, 664 P.2d 1240 (1983); *Clallam Cy. v. Public Empl. Relations Comm'n,* 43 Wn. App. 589, 597, 719 P.2d 140, *review denied,* 106 Wn.2d 1013 (1986). The validity of the Commission's criticisms, however, is not an issue before us on appeal.

---

[4]The Commission observed: "We believe the continuity issue is relevant to the extent that displacement of a certified exclusive bargaining representative by a wholly separate and distinct entity would undermine our own authority to certify bargaining representatives under RCW 41.56.070 and .080. Thus, in an appropriate case, the 'continuity' criterion would allow us to balance the policy against interference in union affairs with our interest in preserving the integrity of the statutorily–sanctioned representation case process. Even then, we believe that our 'hands off' policy with respect to internal union affairs, considered together with the general policy of promoting stability in the workplace compels us to treat the 'continuity' issue with a great deal of caution. As the *FIEA* Court suggested, union reorganization may range from very minor changes to ones that are extremely significant. We will not be inclined to overturn a purported union affiliation because of lack of 'continuity' unless the organizational change has been so extensive that a certified bargaining representative has been displaced by a wholly different organization, or unless other, more traditional evidence exists that the successor organization lacks majority support." Dec. 2509–A, at 5–6.

Judgment affirmed.

GROSSE, A.C.J., and FORREST, J., concur.

Review denied at 113 Wn.2d 1031 (1989).