Gordon PANTER, William A. Foster, Jim Mallory, Leo Vincent, J.J. Edrington, Joe Tedescucci, R.L. French, John W. Vogt, Tilford Wagers, Jim Burns, Kenneth Pearl, Plaintiffs,

v.

AMERICAN SYNTHETIC RUBBER CORPORATION, United Rubber, Cork, Linoleum and Plastic Workers of America Local Union No. 423, United Rubber, Cork, Linoleum and Plastic Workers of America International Union AFL–CIO, CLC, Defendants.

Civ. A. No. C 84–0293–L(A).

United States District Court,
W.D. Kentucky,
Louisville Division.

Dec. 14, 1984.
Opinion on Motion to Dismiss
Sept. 4, 1986.

Michael L. Boylan, Louisville, Ky., for plaintiffs.

J.J. Wantland, Shepherdsville, Ky., for Edrington.

Charles L. Woods, Tony Coleman, Louisville, Ky., for American Synthetic Rubber Corp.

John F. Stewart, Dennis F. Janes, Louisville, Ky., for United Rubber.

Paul Malesick, Akron, Ohio, for other defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALLEN, Senior District Judge.

Gordon Panter and nine (9) other former employees of American Synthetic Rubber Corporation, hereinafter ASRC, bring this action against ASRC and the United Rubber, Cork, Linoleum and Plastic Workers of America, International Union, hereinafter URW International Union, and its affiliate, Local 423, hereinafter Local 423. Panter and the other plaintiffs are former union members. Plaintiffs allege jurisdiction under 29 U.S.C. § 141 *et seq.*, the Labor Management Relations Act (LMRA); under 29 U.S.C. § 401 *et seq.*, the Labor Management Reporting and Disclosure Act, (LMRDA); and, in their amended complaint, under KRS 344, the Kentucky Civil Rights Act, by pendent jurisdiction.

The case is before the Court on the plaintiffs' motion for injunctive relief requiring ASRC to reinstate them to their former positions, and on the defendants' motions for summary judgment. We will resolve these issues in order.

In March of 1981, ASRC and Local 423 entered into a collective bargaining agreement which provided that all employees with two or more years of seniority had unlimited recall rights upon layoff. The agreement expired on March 1, 1984, at which time ASRC and Local 423 negotiated a new collective bargaining agreement. The new agreement terminated the recall rights of all employees who had been on layoff for more than two years, and provided severance pay for all laid-off employees who agreed to waive any claim to further employment. The plaintiffs were among those affected by this agreement, because they were on layoff at that time and, for the most part, had been on layoff since the summer of 1981. Almost all the plaintiffs are over forty years of age.

After negotiating the new contract, the union leadership submitted the proposed agreement to a ratification vote by the union membership. The union leadership refused the plaintiffs both the right to speak at the meeting, as well as the right to vote on the proposed agreement. The union membership ratified the proposed contract by a sufficient margin, so that the plaintiffs' votes would not have changed the result. Subsequently, the plaintiffs filed this action, alleging a breach of contract against ASRC, a breach of the duty of fair representation, and a violation of the union members' "bill of rights" against Local 423 and the International Union, and age discrimination against both the union and the employer.

Mr. Max Stringfield, Local 423 President, informed the plaintiffs that they "probably" would not be allowed to vote on the proposed contract, subject to the decision of the International Union, which later concurred in his decision. Under the union Constitution, members on layoff are required to obtain a Dues Exemption Certificate in order to preserve their membership rights while on layoff. URW Constitution, Article VI, Section 3(a)(1) and 3(B). If a union member is laid off and fails to request a Dues Exemption Certificate, the URW Constitution directs that the union issue that member a Honorary Withdrawal and Transfer Certificate, Article VII, Section 5(a)(4), which "forfeit[s] that member's rights in the local union and the [International]." Article VII, Section 5(d).

The Constitution limits a member's right to a dues exemption of twelve months, after which the union must issue the member an Honorary Withdrawal and Transfer Certificate, but the member may request an extension from both the local and the International Union. Article VI, Section 3(d). The union contends that the plaintiffs failed to take advantage of the dues exemption, and that they have no legitimate complaint concerning the union's refusal to allow them the right to vote on the proposal or to speak at the meeting. *See generally*, Tr. Vol. II at 27–32.

The plaintiffs presented testimony that they were unaware of the Dues Exemption Certificate requirement, or that Mr. String-

field told them that the cards "were automatically issued." Tr. Vol. 1 at 48, 49, 72, 81, 86, 94–95, 99, 173–74, 187; Vol. II at 191–92. However, the plaintiffs admitted that they did not vote on any issues while they were on layoff. Tr. Vol. I at 59, 75, 83–84, 97–98, 189, and Tr. Vol. II at 62, although one witness for the plaintiffs, Mr. Dohony, testified that he voted and spoke at meetings while on layoff. Tr. Vol. II at 112–15.

The evidence does indicate that the union represented various plaintiffs on several grievances and at disability hearings during the time that they were on layoff and should have possessed a Dues Exemption Card or an Honorable Withdrawal and Transfer Card. Tr. Vol. I at 142, 144, 188; Vol II at 38–39. The evidence also indicates some confusion by the plaintiffs over the precise function of the two cards. E.g., Tr. Vol. I at 77–78, 98–99; Vol. II at 3–4. However, the evidence also indicates that the union did explain the distinction during the December 1980 meeting, although Mr. Dohony, the individual who was listed in the official minutes as having made the representation, testified that he did not know the difference himself. Tr. Vol. II at 3–4.

We also note that the union took a vote to authorize the union leadership to call a strike. The union leadership allowed Mr. Panter to speak at the meeting but did not allow the plaintiffs to vote. Mr. Stringfield testified that the plaintiffs did not request the right to vote at that meeting, and that they did not contest his decision not to allow them to vote. Tr. Vol. II at 65–66. Mr. Stringfield did testify that these members on layoff were allowed to speak at most union meetings as a "courtesy." Tr. Vol. I at 102–03, 114. He testified that he did not allow the plaintiffs to speak at the ratification meeting because he "didn't want an ugly situation to develop. They weren't allowed to vote anyway," and because he "felt that the possibility that a conflict between the regular members and those members on the issue of striking was a highly emotional issue, and I just felt it could get out of control." Tr. Vol. I at 116, See also, Tr. Vol. I at 134–36.

The plaintiffs claim that the union did not represent them adequately in the negotiation process. Essentially, the plaintiffs allege that the union did not bargain "tough enough" with the company during the negotiating process, e.g., Tr. Vol. I at 92, and that there was a "conspiracy" between the union and the company which led to the termination of the plaintiffs' seniority rights. The plaintiffs argue that the union should have called a strike to support the contract demands because the membership had authorized a strike at a previous meeting.

The plaintiffs also introduced evidence of two "suspicious" meetings between union officials and company officials. The first meeting occurred on December 29, 1983, at the Fifth Quarter Restaurant in Louisville. Mr. Stringfield and Mr. Yarbrough, a representative of the International, represented the union, while Mr. Schmidt and Mr. Wall represented the company. The parties testified that the ASRC used this meeting to inform the union that it would seek termination of the plaintiffs' recall rights. Tr. Vol. I at 117–18; Vol. II at 57–58. The evidence indicates that the union officials promptly informed the members of the plaintiff class about the company's forthcoming proposal.

Mr. Leo Vincent testified that he saw Mr. Stringfield and Mr. Wall, an ASRC official, at the Fifth Quarter at some unspecified earlier time in the fall, presumably on October 8, 1983, the Stringfield's anniversary. However, the record is not clear whether Mr. Vincent alleged that Mr. Stringfield and Mr. Wall sat together or separately, and we have no other reference in the record to this alleged incident, which would have occurred some three months prior to the beginning of negotiations. See Tr. Vol. I at 174–75; Vol. II at 56–57.

ASRC proposed that employees would lose recall rights after one (1) year, whether or not they were currently on layoff. Tr. Vol. I at 104. Subsequently, ASRC modified its proposal to apply only to those employees who were then on layoff. Tr. Vol. I at 104–05. The union responded

with a counteroffer, which would have given those persons on layoff recall rights for two years or a time equal to their seniority, whichever was shorter, from the date of the agreement, as well as a complete probationary period. Moreover, this clause would not apply to persons employed as of the date of the agreement. Tr. Vol. I at 105–07.

ASRC responded with a "last, best, and final" offer (on the same day the old contract expired) which provided that all employees who had been on layoff for more than two (2) years would lose their recall rights, but that the provision would not apply to those persons who were then employed or who were receiving accident and sickness benefits. Vol. I at 108. *See also,* Tr. Vol. II at 44–47, 67–70. The union attempted to obtain a one-month period for those persons who were losing their recall rights to obtain their severance pay. ASRC refused and the parties eventually settled on 48 hours. Understandably, the plaintiffs argue that this provision placed a certain amount of compulsion upon them to accept the severance pay and renounce any claim to future employment.

Mr. Stringfield testified that he kept Mr. Panter, the acknowledged leader of the plaintiffs' group, fully informed of the progress of the negotiations, and that he gave him a list of laid-off employees and their telephone numbers so that he could set up a committee of those people who would be affected by this proposal. Mr. Panter does not dispute this testimony.

Mr. Stringfield and the other union leaders presented the proposed agreement to the union membership without any recommendation whether to accept or reject the proposal. Tr. Vol. I at 110. The membership accepted the proposal by a vote of 79–7. Tr. Vol. II at 71. The membership had authorized the union leadership to call a strike by the vote of 98–3. However, Mr. Stringfield testified that the union membership was opposed to a strike, and the strike vote was taken as a negotiating tactic. Tr. Vol. II at 92–3, 103–05. Mr. Stringfield testified that under normal procedure, if "the final offer of the tentative agreement

is turned down, then the strike is called." Tr. Vol. II at 92. In essence, if the membership had rejected the tentative agreement, i.e., ASRC's "last, best, and final" offer, the local leadership would have sought permission from the International Union to call a strike. According to Mr. Stringfield, the Local could not call a strike without permission from the International, even after taking a strike vote. Tr. Vol. II at 100–01.

The plaintiffs also attack the Local's acceptance of an ASRC proposal in late 1983 which allowed employees the right to choose between possible retirement plans. Apparently, ASRC was concerned that certain employees would retire before the beginning of the new contract. Thus, ASRC offered the employees the chance to choose to retire under the provisions of the old contract (pre-March 1, 1984) or under the new contract (post-March 1, 1984). ASRC officials testified that the company was afraid of losing valuable employees just when it was beginning to rebuild its business. Thus, ASRC improved its pension plan offer under the new contract and allowed employees the option of retiring under either contract. Tr. Vol. I at 156–59. *See also,* Vol. II at 51–54, 66–67.

ASRC official Don Schmidt also testified that the reason that the company pushed the recall clause so hard was that the company was unwilling to rehire some 35 of the approximately 50 workers on layoff, although he did not identify any of the plaintiffs as belonging to that category. Tr. Vol. I at 151–54. Mr. Schmidt admitted that the workers had nothing adverse in their disciplinary records, but that it was possible for a person to be a poor worker and still not have any disciplinary record. Mr. Schmidt stated that the company felt very strongly about the clause and was willing to accept a strike in order to obtain the desired clause. Tr. Vol. I at 166.

Mr. Stringfield also testified to the company's adamant position and to the hard bargaining that went on between the parties. He agreed that he believed that the company would accept a strike. He also testified that he arranged for the interven-

tion of a Federal Mediator, and that the Mediator advised him that the company appeared likely to accept a strike if it did not achieve its goal of cutting off the plaintiff's recall rights. Tr. Vol. II at 67–72.

■ With respect to the plaintiffs' motion for injunction, we believe that the Sixth Circuit Court of Appeals' decision in *Aluminum Workers International v. Consolidated Aluminum Corporation*, 696 F.2d 437, 442–44 (1982) is dispositive. In that case, the parties had entered into a collective bargaining agreement which contained a broad grievance and arbitration provision. The corporation-appellant notified the appellee union that it intended to restructure certain job classifications with the ultimate effect of eliminating 16 employees. The union objected and asserted that the company did not have the right to make the reclassifications. When the company implemented its plan, the union filed suit and the District Court ordered the company to reinstate the 16 laid-off employees, and to return to the *status quo ante* pending arbitration.

On appeal the Appellate Court held that the union could not prove that it would suffer irreparable harm. The Court, in essence, held that loss of employment, which is the result of job eliminations by a solvent employer, will not support a claim by the union for injunctive relief, if the employer is solvent and has the ability to reinstate its employees or pay the wages for the period of unemployment. Judge Martin, speaking for the Court, held that although the union could point to repossessions, foreclosures, and injury to credit status which might befall the 16 jobless employees, these potential damages were speculative, and would materialize only in select cases, and only when the parties were unable or unwilling to commence arbitration. *Id.*, at 444.

Judge Martin also referred to the availability of unemployment relief, health insurance, and financial support from the union, and to the fact that the award of back pay could be used to repair any damage to credit or to repurchase goods repossessed by creditors during the arbitration.

*Id.*, at 444. While the Sixth Circuit opinion heavily emphasized the various effects that the injunction would have on the arbitration process, the Court, for a third time on page 445, stated that the critical issue was whether the injuries complained of could not be adequately redressed by an arbitrator's award.

In the instant case, we do not have an arbitrator's award but we do have a complaint for damages. While we perceive no threat to the arbitration process here, since none is involved, we believe that the potential right to damages is to be considered in the same light as is the potential right to back pay where arbitration is concerned.

Even if the element of irreparable injury were present, we do not believe that plaintiffs have met all of the four tests which must be addressed before a preliminary injunction is issued. They are set out in *Mason County Medical Association v. Knebel*, 563 F.2d 256 (6th Cir.1977) and are as follows:

1. Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2. Whether the plaintiffs have shown irreparable injury;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others;

4. Whether the public interest would be served by issuing a preliminary injunction.

In the case at bar, for reasons which will be more fully discussed in the opinion, we do not believe that plaintiff has shown a probability of success on the merits. We, therefore, overrule plaintiffs' motion for an injunction ordering the ASRC to recall plaintiffs.

■ Plaintiffs allege that their rights under the Landrum-Griffin Act were violated by the union. *See* 29 U.S.C. § 411 *et seq.* The plaintiffs rely heavily upon *Alvey v. General Electric Company*, 622 F.2d 1279 (7th Cir.1980). In that case, the union's constitution required members in good standing to pay dues but prevented members on layoff from making dues pay-

ments. Therefore, those persons on layoff had no chance to either speak or vote at a union meeting, during the course of which the union membership adopted a contract proposal which affected their recall rights.

The *Alvey* Court held that the union had violated 29 U.S.C. § 411(a)(1) by barring the members "from participating in *all* union matters regardless of their willingness to pay dues or the extent to which the union matters may compromise, or as here, extinguish, their rights." *Id.* at 1285. The *Alvey* Court also stated that a member on layoff remained "a member in substance" until he withdrew or was "expelled or suspended after appropriate proceedings," *Id.* at 1284; *See also*, 29 U.S.C. § 402(*o* ). Other courts, however, have held that a union may limit voting to members in "good standing" or limit voting to those whose interests are directly affected by the issue. *See American Postal Workers Local 685 v. American Postal Workers Union,* 665 F.2d 1096, 1103 (D.C. Cir.1981) and *Taylor v. Great Lakes Seaman's Union, Local 5000,* 701 F.2d 590, 591–92 (6th Cir. 1983).

The primary concern in *Alvey* was that the union constitution prevented members on layoff from exercising their rights while on layoff. In the instant case, the union Constitution allowed members to obtain a Dues Exemption Card which would allow them to continue to participate in union meetings as members. In fact, the evidence shows that Panter himself and another plaintiff, Mr. Foster, did obtain these cards for one year, but that they did not attempt to renew them.

As the *Alvey* Court points out, when considering a challenge to a union's rules concerning a member's good standing, this Court must consider a balance between the " 'anti-democratic effects' of the rule and the [union] interests urged in its support." 622 F.2d at 1283 (citing *United Steelworkers v. Usery,* 429 U.S. 305, 310, 97 S.Ct. 611, 615, 50 L.Ed.2d 502 (1977).)

In this case, the union has a legitimate interest in making sure that the union's decisions are made by those who are actively involved in the union's activities. The union has a legitimate interest in requiring that those persons who are interested in working with the union and availing themselves of union benefits demonstrate that interest by becoming sufficiently involved in the union that they maintain some specific official tie to the union, i.e., by maintaining a Dues Exemption Card, which, as we noted above, is renewable.

In this case, the plaintiffs could easily request a Dues Exemption Card. In fact, two plaintiffs performed that function. The union Constitution also provided a mechanism which allowed the plaintiffs to request an extension of the Dues Exemption Card after its expiration. Although none of the plaintiffs even attempted to apply for this extension, the plaintiffs allege that the union officials misled them into thinking that the dues exemption was automatic. We also note evidence that the union officials did explain members' duties at regular union meetings. Furthermore, the Constitution specifically spells out each member's duties with regard to payment of dues. While several plaintiffs testified that they did not possess a copy of the Constitution, we note that a union member has a duty to become familiar with his rights and duties as a union member and as a member of the bargaining unit. *E.g., Baldini v. Local 1095,* 581 F.2d 145, 148–49 (7th Cir.1978); *Newgent v. Modine Manufacturing Company,* 495 F.2d 919, 928 (7th Cir.1974).

The plaintiffs also attempt to show that the union is estopped from denying them speaking and voting rights because of the union's course of conduct or practice of allowing the members on layoff to speak at prior meetings and allowing some of them to vote at some meetings. Again, we do not find any clear course of action. The plaintiffs' testimony, with the exception of Mr. Dohoney, agreed that they were not allowed to vote at union meetings.

The union's denial of the right to speak causes this Court some serious concern. The union had established a "practice and pattern" of allowing the members on layoff the chance to speak at most if not all meetings, including those where votes

would take place. Mr. Stringfield based his decision not to allow the plaintiffs to speak upon both advice from International Union officials and on his fear of an "ugly situation."

In general, the plaintiffs complain that the union did not inform its members, either those active or those on layoff, of its meetings, rules, and regulations. The plaintiffs allege, for example, that union meetings were always held during the second shift, and that many of the plaintiffs worked the second shift and were unaware of the union's rules concerning the Dues Exemption Cards. Furthermore, the plaintiffs urge that there is no clear evidence supporting the union's claim that it informed the membership of all its activities. We agree that the union's conduct of its meetings leaves a great deal to be desired in the way of formalities and clarity in its record keeping. *See, e.g.,* Tr. Vol. II at 76–77, 99–100. We also believe that disputed issues of material fact remain; and therefore, the defendants' motion for summary judgment on the Landrum-Griffin claim is denied.

▉ The plaintiffs' next allege a breach of the duty of fair representation. While the plaintiffs were not members of the union in good standing, they were still members of the bargaining unit. In other words, the plaintiffs still had rights which flowed from the collective bargaining agreement, i.e., their recall rights. As long as they had those rights, the union was under a duty of fair representation to guard those rights. This case does not involve people who were no longer members of the bargaining unit as was the case in *Cooper v. General Motors Corporation,* 651 F.2d 249, 250 (5th Cir.1981).

However, the union has a very wide latitude in exercising that duty. As the Seventh Circuit has noted, the Supreme Court has established two separate standards for breach of the duty of fair representation. Initially, the Supreme Court allowed the union a "wide range of reasonableness" when negotiating contracts for the members which it represents. *Ford Motor Company v. Huffman,* 345 U.S. 330, 338,

73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953). Thus, as the *Alvey* Court noted, the union may lawfully "follow the dictates of the majority if they determined that the decision reflected a proper resolution of conflicting but legitimate interests." 622 F.2d at 1289. On the other hand, the Seventh Circuit has noted that the Supreme Court defined a more specific and somewhat higher standard when dealing with employee grievances under the standard of *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed. 2d 842 (1967). *See Schultz v. Owens–Illinois Incorporated, District No. 9,* 696 F.2d 505, 514–15 (7th Cir.1982). *See generally* Leffler, *Piercing the Duty of Fair Representation: The Dichotomy Between Negotiations and Grievance Handling,* 1979 U.Ill.L.F. 35 (1979).

In this case, we confront a union's handling of a negotiation situation, which calls for the less severe "wide range of reasonableness" standard noted above. The plaintiffs argue that the union did not bargain "tough enough" in the words of Mr. Panter. Essentially, Mr. Panter and his colleagues assert that the union should have called a strike in order to protect their rights, and that the strike vote indicated the union members' support for the plaintiffs' position. Mr. Stringfield testified that the vote was a negotiating tactic, and that the union members would not have supported a strike. He further stated that the union members could have indicated support for the plaintiffs by simply rejecting the contract. Finally, ASRC official Don Schmidt testified that the company would have taken a strike in order to get its desires.

Initially, we note that the issue of the breach of fair representation is a question of fact for a jury. *E.g., Cox v. C.H. Masland & Sons, Inc.,* 607 F.2d 138, 142–43 (5th Cir.1979); *Minnis v. International Auto Workers,* 531 F.2d 850, 852–53 (8th Cir.1975). The burden of proof is by a preponderance of the evidence, *Dill v. Greyhound Corporation,* 435 F.2d 231, 237–38 (6th Cir.1970), and this Court has jurisdiction over a breach of fair representation in negotiation claim under Section

301 of the LMRA, 29 U.S.C. § 185. *Farmer v. ARA Services, Inc.,* 660 F.2d 1096, 1106 (6th Cir.1981).

We find summary judgment appropriate on this issue. Mr. Panter can only point to his generalized feelings that the union "should have bargained tougher" during negotiations or that the union should have called a strike. We find no authority for imposing a "duty to strike" on the union, and we find no factual allegation to support any claim that the union could have taken any step to preserve the plaintiff's recall rights other than a strike. While the Court may entertain some personal doubt as to the vigor with which the union presented its counter-proposals to the company, we have absolutely no doubt that the company had taken an adamant position on the question of recall rights and would have suffered a strike in order to preserve its position. Again, we find no evidence that the union could have taken any position which would have reached an agreement but still retained the plaintiff's recall rights. For example, the plaintiffs have not offered any evidence that the union membership would have voted to strike if the union leadership had proposed a strike.

Furthermore, we note that the union must also represent the other members of the union. In effect, the union must balance the plaintiffs' rights along with the desires of the UAW local union. All except one had been originally hired as unskilled production workers. Under the General Motors–UAW contract, most General Motors workers acquire plant-wide seniority on a one-for-one basis. There was, however, a separate seniority list for skilled employees, and one-for-one skilled trades seniority was acquired only when an employee was actually working in a trade. Such seniority was issued for purposes of layoff and recall within the skilled trades classification.

Prior to the lawsuit, an unskilled employee who sought to enter the General Motors skilled trades program was required to work for four years before he acquired any seniority rights in the skilled trades classification. Thereafter, he would continue to work under supervision for four years, after which, having successfully completed the training program, he would be reclassified as a skilled trades journeyman and afforded four years of seniority within that skilled trades classification for his eight-year training period. In effect, such employees before December 13, 1976 received one-for-two seniority.

Effective December 13, 1976, General Motors and UAW, through collective bargaining, amended the seniority provisions. The amendment provided that participants in training for skilled trades would prospectively be afforded seniority on a one-for-one basis within the skilled trades classification. This provision was obviously advantageous to new unskilled workers, but was not retroactively applied to the plaintiffs who were in the skilled trades training program. The other members of the union. For example, the plaintiffs complain that the union accepted a company proposal in late 1983 which had the effect of allowing union members then employed to postpone retirement until after the adoption of the new contract. The new pension plan allowed the employees to retire under their choice of the better of the two agreements. This agreement effectively persuaded several older members not to retire until after the adoption of the new contract, which had eliminated the plaintiffs' recall rights. Thus, the company was able to replace the retired employees with new hires instead of recalling the plaintiffs with their established seniority.

We conclude that had the union refused to accept this plan, the current employees could have filed exactly the same type of action against the union for breach of the duty of fair representation as the plaintiffs have filed in this case. Simply put, we find a case of hard bargaining by the company which was able to exert its economic power against its employees. We find no law against "tough" bargaining, either by the company or by the union. As the Eighth Circuit recently noted, federal labor law requires bargaining, it does not require agreement. *Johnson v. Air Line Pilots,* 650 F.2d 133, 137 n. 3 (8th Cir.1981).

Very recently counsel for the defendant union called the Court's attention to the case of *Shamblin v. General Motors Corporation*, 743 F.2d 436 (6th Cir.1984). In that case, all of the plaintiffs were employees of General Motors and members plaintiffs claimed that the UAW should have secured a seniority agreement which would have provided them retroactively with one-for-one seniority for their skilled trades training.

Circuit Judge Edwards, in his opinion for the Court affirming the district judge's grant of summary judgment to the defendants, cited language from both *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338–39, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953) and *Humphrey v. Moore*, 375 U.S. 335, 349–50, 84 S.Ct. 363, 371–72, 11 L.Ed.2d 370 (1964), which points out that conflict between employees represented by the same union is a recurring fact, and that a wide range of reasonableness must be afforded to a statutory bargaining representative in arriving at a collective bargaining agreement. The cases further point out that the complete satisfaction of all members of the union in such circumstances is hardly to be expected. *Shamblin v. General Motors Corp., supra,* reinforces our conclusion that the defendants are entitled to summary judgment on the issue of fair representation.

■ Plaintiffs have also alleged age discrimination under Kentucky law, KRS 344.-040 *et seq.* and seek injunctive relief in the form of reinstatement and also damages. We find nothing in the Kentucky Civil Rights Act that does away with the plaintiffs' burden of proving irreparable harm. While the plaintiffs cite *City of Los Angeles, Department of Water and Power v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978), we believe that the decisions of the Sixth Circuit Court of Appeals in *Aluminum Workers International v. Consolidated Aluminum Corporation, supra,* and *Equal Employment Opportunity Commission v. Anchor Hocking Corporation*, 666 F.2d 1037 (6th Cir. 1982) are controlling. Therefore, we repeat our previous holding that plaintiffs are not entitled to injunctive reinstatement.

■ Plaintiffs complain that the impact of the collective bargaining agreement of 1984 is disproportionate upon plaintiffs who are over 40 years of age and whose seniority is a result of their age. In *Farmer v. ARA Services, Inc.*, 660 F.2d 1096 (6th Cir.1981), the Court held that a union which participates in a negotiation of a collective bargaining agreement may be found liable to four of its members because the contract was discriminatory against the female members. *Id.*, at 1104 (citing cases).

Defendants move for summary judgment as to the age discrimination issue. Plaintiffs, in response, presented no discussion of their age discrimination claims. The tenor of all the evidence presented at the preliminary injunction hearing also indicated that plaintiffs were relying on the issues of violation of the Landrum Griffin Act and the duty of fair representation, rather than upon any age discrimination claim. No evidence was presented by the plaintiffs as to whether or not plaintiffs are younger than the employees presently working in the defendants' plant, nor have they presented any evidence that new employees of the company, if there have been any since the institution of this suit, are younger than the plaintiffs.

The Sixth Circuit Court of Appeals in the case of *Rose v. National Cash Register Corporation*, 703 F.2d 225 (1983) held that it had "declined to adopt rigid guidelines exclusively establishing a method for proving a *prima facie* case in age discrimination actions." *Id.* at 227. It did say that plaintiff has the burden of proving "he was discharged because of age," citing *Laugesen v. Anaconda Company*, 510 F.2d 307 (6th Cir.1975); or that age must be a determining factor, *see Blackwell v. Sun Electric Corp.*, 696 F.2d 1176, 1180 (6th Cir. 1983); or that age makes a difference, *see Ackerman v. Diamond Shamrock*, 670 F.2d 66, 70 (6th Cir.1982); or that age is a contributing factor, *see Sahadi v. Reynolds Chemical*, 636 F.2d 1116, 117 (6th Cir.1980).

Probably the case nearest in point as to similarity of facts is that of *Massarsky v.*

*General Motors Corp.*, 706 F.2d 111 (3rd Cir.) *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983). There the plaintiff relied upon theories of both disparate treatment and disparate impact. The Court recited that in order to establish a *prima facie* case of disparate impact, plaintiff was compelled to show that the employer's selection process resulted in unfavorable treatment of a disparate number of members of the protected group to which the plaintiff belongs. *Id.* at 120.

In *Massarsky, supra*, the Court pointed out that under the General Motors' policies, General Motors students who were insulated from layoffs may generally have been younger than employees who were laid off in their place. The Court pointed out that even if all the laid off employees were older than the students who received special treatment, ADEA would not be violated, unless those who were aged 40 to 70 were disparately represented among the laid off employees.

In the instant case, plaintiffs have simply failed to present the Court with statistical proof as to the effect of the layoff policies contained in the collective bargaining agreement. The Court has been presented with no proof as to what the age computation is of those members of the union who had not been on recall for more than two years.

The *Massarsky, supra,* case refers to *Geller v. Markham*, 635 F.2d 1027 (2nd Cir.1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). In that case, there was a hiring policy that made over 90% of the protected age class ineligible for appointment to teaching positions. The policy also resulted in the exclusion of the majority of teachers over the age of 40. In *Geller, supra,* the Court held that the defendant could not assert as a viable defense the employment policy which was based in part on purely economic cost-cutting grounds in the face of tight budgetary constraints. The Court cited 29 C.F.R. § 860.103(h) (1979), *Marshall v. Arlene Knitwear, Inc.*, 454 F.Supp. 715, 728 (E.D. N.Y.1978), and *Laugesen v. Anaconda Co., supra.*

In the case at bar, no evidence has been produced as to the reason for the decision of the company to insist upon the provision that no employee with more than two years layoff should be recalled. The lack of such evidence, however, is not harmful to the defendants, since the plaintiffs have failed to present the Court with any evidence that would meet their *prima facie* burden of showing an employment practice that is facially neutral in its treatment of different groups but, in fact, falls more harshly on one group than another and cannot be justified by business necessity. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

In light of the failure of the plaintiffs to present a *prima facie* case as to the age discrimination issue, the motion of the defendants for summary judgment will be granted. We have this day entered a judgment in accordance with these findings of fact, conclusions of law and memorandum opinion.

## JUDGMENT

This action, having been heard by the Court without a jury on the plaintiffs' motion for a preliminary injunction, the evidence having been transcribed, and the Court, having entered its findings of fact, conclusions of law and memorandum opinion, and being fully advised in the premises,

IT IS ORDERED AND ADJUDGED that plaintiffs' motion for a preliminary injunction based upon alleged violations of the Landrum Griffin Act, the duty of fair representation, and KRS 344 *et seq.*, is hereby denied.

IT IS FURTHER ORDERED AND ADJUDGED that defendants' motion for summary judgment upon alleged violations of the duty of fair representation and KRS 344 *et seq.* is hereby granted.

IT IS FURTHER ORDERED that defendants' motion for summary judgment on plaintiffs' claim of Landrum Griffin Act violations is hereby denied.

This is not a final and appealable judgment, except as to that portion of the judgment which denies the plaintiffs' motion for a preliminary injunction which is appealable.

## ON MOTION TO DISMISS

This case is submitted to the Court upon the motion of the defendant Unions, Local 423 and the International Union, for summary judgment, and the motion to dismiss filed by the Defendant, American Synthetic Rubber Corporation, hereinafter referred to as "ASRC", which the Court will treat as a motion for summary judgment. The Court will first discuss the motion of the corporation.

Plaintiffs' claim that ASRC violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* by arbitrarily denying their claims to severance pay. In March 1981, ASRC and Local 423 agreed to a three-year collective bargaining agreement. Under that agreement, laid-off employees with two or more years of seniority retained recall rights no matter how long they had been on layoff unless they requested and received severance pay in which case they lost all seniority and recall rights. Under the new collective bargaining agreement entered into in March 1984 between the Union and ASRC, all employees who had been laid-off for more than two years lost their right to recall. Again, even if they were laid-off for less than two years, they lost their seniority and recall rights under the new agreement if they requested and received severance pay.

The Union, in its negotiations with the company which led to the 1984 agreement, proposed that all former employees of the company who had been on layoff for more than two years should receive the right to severance pay provided that they made application for it within thirty days of the execution of the 1984–1987 agreement. The company refused to accept this proposal, but instead reached an agreement with the Union that Union members would have forty-eight hours after the 1984–1987 agreement was ratified within which to request their severance pay. A letter which informed these employees that they had to request their severance pay by March 9, 1984 was mailed on March 2, 1984.

None of the plaintiffs, with the exception of J.J. Edrington, made application for severance pay by March 9, 1984. Article XVIII of the 1981 contract provided that employees who decided to take severance pay would lose their seniority and recall rights upon receipt of that pay. It should also be noted that Edrington, in his letter requesting severance pay, stated that his acceptance of severance pay should not be construed as a waiver of his rights under the contract or under the law.

■ Plaintiffs' contention that ERISA was violated must be rejected. The right to severance pay constitutes a welfare plan that may be modified to the prejudice of some employees. Under the holding in *Sutton v. Weirton Steel*, 724 F.2d 406 (4th Cir.1983), employees' rights to severance pay may not only be modified without violating ERISA but must be governed by the pertinent employment agreements. *Id.*, at 410.

■ Plaintiffs' allegation that ASRC acted arbitrarily and capriciously in violation of ERISA does not state a claim. In *Sutton*, the court held that an employer, which is the administrator of a severance pay plan, would not breach its fiduciary responsibilities by agreeing with the unions to a modification which adversely affected some employees' rights to severance pay. The court clearly held that the law does not prohibit an employer from exercising the right to renegotiate or amend unfunded contingent benefits payable before normal retirement age. *Id.*, at 410–11.

■ Finally, the plaintiffs' claim that ASRC attempted to:

coerce and manipulate Plaintiffs and others who were subject to termination [on] 3/1/84 to sign away any claim to any legal action against Defendant Company and Defendant Union regarding loss of seniority rights, all of which is a violation of ERISA, 29 U.S.C. § 1001 et seq., including but not limited to 29 U.S.C. § 1141.

Plaintiffs' reliance upon 29 U.S.C. § 1141 is misplaced since that statute is criminal in nature and can be enforced only in a criminal action. *See West v. Butler*, 621 F.2d 240, 244 (6th Cir.1980). However, Plaintiffs' claims under 29 U.S.C. § 1141 may be treated as though they were brought under 29 U.S.C. § 1140. *Id.* That civil prohibition section provides in essence that it is

unlawful for any person to discharge, fine, suspend, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit] plan, this title [29 U.S.C. § 1001 *et seq.*], or the Welfare and Pension Plans Disclosure Act [29 U.S.C. §§ 301–309]. 29 U.S.C. § 1140.

This provision is designed primarily to protect an individual's pension rights. *See West, supra,* 621 F.2d at 245, *citing* 119 Cong. Rec. 30374 ("Especially vulnerable are managers and executives whose substantial pension potentialities provide an incentive to their discharge before vesting."

In the case at bar, ASRC did not suspend, discharge, expel, discipline or discriminate against the plaintiffs *because* they had exercised a right to which they were entitled under ERISA or an employee benefit plan or the Welfare and Pension Plan Disclosure Act. The only rights which Plaintiffs had to severance pay were conferred upon them by the 1981 collective bargaining agreement and by the memorandum agreement of 1984 between the Union and the ASRC. These rights were contractual in nature and Plaintiffs cannot point to any breach of contract even though the period of time given for exercising the severance rights was extremely short. However, the right to severance pay was strictly subject to negotiation between the Union and the company and the Court cannot interfere with an agreement legitimately reached between these two entities, notwithstanding the possibility that some plaintiffs conceivably may have lost

their right to severance pay because of the shortness of time within which to make a decision as to whether to apply for the severance pay. We reach the conclusion therefore that the plaintiffs' remaining claims against ASRC, with the exception of Mr. Edrington's, should be dismissed with prejudice.

■ With regard to the Defendant Union's motion for summary judgment, the Plaintiffs contend that they had a right under the Landrum-Griffin Act, 29 U.S.C. § 411 *et seq.* to participate in the vote which led to the ratification by the Unions of the 1984–1987 collective bargaining agreement. The problem with the Plaintiffs' theory is that Plaintiffs failed to maintain their status as union members prior to the March 7, 1984 meeting which resulted in the ratification of the agreement. The Plaintiffs did not preserve their union membership. Under the terms of the union constitution, the Plaintiffs could have maintained their good standing as union members by obtaining a dues exemption. The failure to obtain a dues exemption for a period of ninety days caused them to forfeit all rights and privileges of union members. All of the members, except Gordon Panter, were removed from the membership rolls of the union in August 1981 after they had fallen three months behind in the payment of membership dues. Panter did receive a dues exemption but did not request an extension, even though an extension was authorized by the constitution. He therefore lost his union membership three months after his dues exemption expired.

In the case of *NLRB v. Financial Institution Employees of America*, 475 U.S. 192, 106 S.Ct. 1007, 89 L.Ed.2d 151 (1986), the Supreme Court held that the National Labor Relations Board could not promulgate a rule that required that non-union employees be permitted to vote in a certified union's decision whether to affiliate with other unions. The court based its decision in part upon the theory that the National Labor Relations Act allows unions members to control the shape and direction of their organization and as a result non-

union employees have no voice in the affairs of the union. *Id.,* 475 U.S. at 205, 106 S.Ct. at 1015.

We are reinforced in our opinion by the language contained in *Alvey v. General Electric Company,* 622 F.2d 1279 (7th Cir. 1980). That case points out that the Landrum-Griffin Act, 29 U.S.C. § 411(a)(1) guarantees all union members equal rights and privileges, including the right to participate in the deliberation and voting upon the business of membership meetings. That right, however, is not absolute. Section 411(a)(1) contains a proviso that makes the right subject to reasonable rules and regulations in the union's constitution and by-laws. Section 411(b) also provides that constitutional or by-law provisions inconsistent with subsection (a) shall be of no force and effect.

In *Alvey,* the court pointed out that the right of a union to limit participation in union affairs to members in good standing is clearly reasonable. *Alvey,* 622 F.2d at 1284. However, the court was "faced with a substantially more onerous rule that not only limited participation in union affairs to members in good standing but precluded ... those on layoff" from payment of dues to maintain their good standing. As a result, the members on layoff were "barred from participating in all union matters regardless of their willingness to pay dues or the extent of which the union matters might compromise or nearly extinguish their rights." *Id.,* at 1284–85.

While the *Alvey* court held that the union's provision which precluded the former union members who were on recall from voting or speaking at union meetings on questions affecting their economic interests was of no force or effect, it specifically did so because the plaintiffs, who were on layoff, were precluded from maintaining their union membership.

In the instant case, the plaintiffs have not been precluded from remaining as union members. They could either have paid their dues on a current basis or obtain successive 90–day exemptions from payment of dues which would have allowed them to maintain their membership in good standing.

Finally, we note that 29 U.S.C. § 402(*o*) provides that one is a member of a union organization when he has fulfilled the requirements for membership and has neither voluntarily withdrawn nor been expelled or suspended from membership. The failure to pay dues or to apply for an exemption from the failure to pay dues is a voluntary act on the part of the employees on recall. They were not coerced into discontinuing their union membership but simply chose not to exercise their right to continue their union membership in the manner required by the union's constitution and by-laws.

We note also that 29 C.F.R. §§ 452.86 and 452.92 provide that a laidoff employee may maintain good standing for the purpose of remaining eligible to vote on union matters by tendering dues which the union cannot refuse to accept. Here the plaintiffs were granted that right by the union and yet failed to take advantage of the right guaranteed by both the union and the Code of Federal Regulations.

The Court recognizes that the interests of laidoff employees such as plaintiffs in matters that will alter or effectively extinguish their recall rights is a most vital one. *Alvey, supra,* 622 F.2d at 1285. However, plaintiffs had the option of maintaining their rights to vote on these vital matters by either paying dues or procuring exemptions and failed to do so.

For the reasons set out above, the motion of the company and the union for summary judgment must be sustained.

## JUDGMENT

Defendant, American Synthetic Rubber Corporation, having moved to dismiss the remaining claim of the plaintiffs, and the Court having considered said motion to dismiss as a motion for summary judgment, and having entered its memorandum opinion, and being fully advised in the premises,

IT IS ORDERED AND ADJUDGED that all remaining claims of the plaintiffs

against the defendant, American Synthetic Rubber Corporation, are dismissed, with the exception of the claim of J.J. Edrington for severance pay.

IT IS FURTHER ORDERED AND ADJUDGED that the motion of the defendants, Local and International Unions, for summary judgment be, and they hereby are sustained for the reasons set out in the memorandum opinion of the Court.

This is not a final and appealable judgment.