**MINN–DAK FARMERS COOPERATIVE,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Respondent.**

**MINN–DAK FARMERS COOPERATIVE,**
**Respondent,**

v.

**NATIONAL LABOR RELATIONS**
**BOARD, Petitioner.**

Nos. 93–2530, 93–2698.

United States Court of Appeals,
Eighth Circuit.

Submitted May 12, 1994.

Decided Aug. 22, 1994.

John J. McGirl, Jr., Minneapolis, MN, argued (James C. Ohly, on the brief), for appellant.

William A. Baudler, Washington, DC, argued (Linda Dreeben and Deborah E. Shrager, on the brief), for appellee.

Before MAGILL, Circuit Judge, FLOYD R. GIBSON and JOHN R. GIBSON, Senior Circuit Judges.

JOHN R. GIBSON, Senior Circuit Judge.

Minn–Dak Farmers Cooperative petitions for review of an NLRB order requiring it to bargain with American Federation of Grain Millers Local 405, which was formerly an independent union composed only of Minn–Dak employees. The NLRB cross-petitions for enforcement of the same order. Minn–Dak recognized the local union before, but not after, its affiliation with the international union. Minn–Dak claims the union conducted the affiliation vote without due process safeguards and that there was a substantial change in representation after the affiliation. On the strength of these claims, Minn–Dak

refused to bargain with the union and unilaterally instituted an employee grievance procedure that bypassed union participation. The NLRB found Minn–Dak had engaged in an unfair labor practice and ordered it to recognize the Local. *Minn–Dak Farmers Coop.*, 311 N.L.R.B. No. 91 (1993). We deny Minn–Dak's petition for review of the NLRB order and we grant the NLRB's cross-petition for enforcement.

Minn–Dak manufactures beet sugar, in a primarily seasonal operation, which peaks immediately after the sugar beet harvest. During the 1990–91 peak season, Minn–Dak employed about 280 production and maintenance workers, but during the off-season, it employed only about 140 workers.

The Minn–Dak employees were formerly represented by an independent union, the Minn–Dak Farmers Cooperative Employees' Association. In July 1991, the Association had about seventy-eight dues-paying members, all of whom were Minn–Dak employees. The Association's Executive Committee became interested in affiliating with the American Federation of Grain Millers. The Association held a meeting to discuss the affiliation issue. The Association then sent notice to all Minn–Dak production and maintenance employees that it would hold a meeting for the purpose of voting on the question of affiliation. Of the 181 employees who voted, seventy-seven were dues-paying members of the Association. The voting was by secret ballot and the Association did not segregate the votes of Association members from those of other employees. The vote was in favor of affiliation by 103 to 78.

The Association consequently became Local 405 of the American Federation of Grain Millers.[1] The old Association's president and shift representatives became president and officers of the new local (with the addition of a new local secretary/treasurer who was not an officer of the old Association). All the members of the new Local 405 are Minn–Dak employees.

Upon being informed of the affiliation, Minn–Dak management stated that it refused to recognize the Association's "attempt at affiliation" or to "bargain with the Grain Millers Union." Minn–Dak's stated rationale for the decision was that the affiliation vote was not conducted in accordance with the Association's bylaws, which provided:

> The Executive Board of the Association may propose affiliation with other organizations, and if the proposal is approved by a *majority vote of Association members*, Association members must also maintain membership in the affiliate organization in accordance with the affiliation agreement.

(emphasis added).

Minn–Dak interprets this language to require a majority of all Association members, not just of those members voting, to vote in favor of affiliation. Minn–Dak claims that all 280 employees are "members"[2] and that without 141 votes the Association could not affiliate, even though that was the choice of the majority of those voting.

After voicing this objection to the new Local, Minn–Dak proposed a grievance procedure and refused to accept grievances unless the employees agreed to Minn–Dak's proposal. This forced a Minn–Dak employee to present his grievance to Minn–Dak as an individual, without union representation.

The Local and the AFGM charged Minn–Dak with an unfair labor practice. The NLRB set out the legal principles governing the case:

> Once certified by the Board or voluntarily recognized by an employer as the majority representative of a unit of employees, a union enjoys a presumption of continuing majority support and the employer has a corresponding continuing obligation to recognize and bargain with the union. The union's subsequent affiliation with a na-

---

1.  Local 405 was not granted a charter immediately, because the AFGM made issuance of a charter contingent on Minn–Dak's recognition of the Local.

2.  The meaning Minn–Dak assigns to "member" is variable. At some times Minn–Dak uses "member" to mean "Minn–Dak employee" (i.e.

one of 280), and at other times it uses the word to mean "dues-paying member of the Association" (i.e., one of 78). The NLRB noted this discrepancy, *see* 311 N.L.R.B. No. 91, slip op. at 5 n. 9, but thought it unnecessary to decide which was the proper definition.

tional or international organization does not, standing alone, affect the union's representative status or terminate the employer's duty to bargain with the union.... [F]ollowing a union's affiliation with a national or international organization, an employer's duty to bargain with the union continues *unless the vote on affiliation was not conducted with adequate due-process safeguards or the changes caused by the affiliation were so "dramatic" that the postaffiliation union lacked substantial continuity with the preaffiliation union.*

Slip op. at 3–4 (citations omitted) (emphasis added).

Minn–Dak argued that the affiliation vote lacked the "due-process safeguards" the NLRB considers necessary. The NLRB concluded that the vote was in fact accompanied by such safeguards. Specifically, the NLRB held that as long as the union members had a "proper opportunity to express their desires," the fact that the election procedures violated "an internal union rule," did not invalidate the election, at least as far as the employer was concerned. Slip op. at 4.

Minn–Dak also argued that the affiliation changed the nature of the Association because the AFGM constitution gave the AFGM power to control certain decisions of the Local. Slip op. at 6. The NLRB held that the fact that the AFGM constitution gave it power to control the Local in certain matters "does not support a finding of lack of substantial continuity absent evidence that the such [sic] authority was exercised with some regularity." Slip op. at 6. There was no such evidence.

Accordingly, the NLRB entered a cease and desist order, requiring Minn–Dak to recognize and bargain with the Local, and to cease bypassing the Local in connection with the grievance policy. Slip op. at 7–8.

Minn–Dak petitions for review of the NLRB order, and the NLRB cross-petitions for enforcement. Minn–Dak renews its arguments that the affiliation election lacked

due process safeguards and that there was not substantial continuity between the pre-affiliation Association and the post-affiliation Local 405. The "due process" and "continuity" tests are actually indicia of a more fundamental issue: whether there is a "question of representation." *See NLRB v. Financial Inst. Employees ("SeaFirst")*, 475 U.S. 192, 199–200, 106 S.Ct. 1007, 1011–1012, 89 L.Ed.2d 151 (1986); *Seattle–First Nat'l. Bank v. NLRB*, 892 F.2d 792, 797 (9th Cir.), *cert. denied*, 496 U.S. 925, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990). " 'A question of representation' is defined as sufficient doubt about the union's continuing status as the legitimate representative of employees in a particular unit that a new election should be conducted to determine employee sentiment." *Seattle–First*, 892 F.2d at 797.

■ Minn–Dak does not attack the validity of the NLRB's "due process" and "continuity" tests, either in general or with regard to any particular component of either test. Minn–Dak only argues that the NLRB reached the wrong result in its case. Whether a question of representation exists is a factual issue to be determined by the Board. *NLRB v. Commercial Letter, Inc.*, 496 F.2d 35, 39 (8th Cir.1974); *May Dep't Stores Co. v. NLRB*, 897 F.2d 221, 226 (7th Cir.), *cert. denied*, 498 U.S. 895, 111 S.Ct. 245, 112 L.Ed.2d 204 (1990). The Board's findings are entitled to deference if supported by substantial evidence on the record as a whole. *Commercial Letter*, 496 F.2d at 39.

■ The Board has held that an affiliation election will not be held to lack due process safeguards solely because the election procedures violated the union's internal rules. *E.g., Toyota of Berkeley*, 306 N.L.R.B. 893, 901 (1992), *vacated in part on other grounds*, 313 N.L.R.B. No. 108 (Feb. 2, 1994); *F.W. Woolworth Co.*, 305 N.L.R.B. 775, 779 (1991); *Santa Barbara Humane Soc.*, 302 N.L.R.B. 833, 837 (1991). Minn–Dak argues that NLRB precedent says otherwise, but the cases it cites simply do not support its argument.[3] The NLRB's approach is consistent

---

3. Minn–Dak cites *Aurelia Osborn Fox Memorial Hosp.*, 247 N.L.R.B. 356, 359 (1980); *Canton Sign Co.*, 174 N.L.R.B. 906, 908 (1969), *enforce-

ment denied*, 457 F.2d 832 (6th Cir.1972); and *National Carbon Co.*, 116 N.L.R.B. 488, 502 (1956), *enforced, Union Carbide & Carbon Corp. v.

with the thinking of *SeaFirst*, which stressed that an employer cannot "invoke a perceived procedural defect [in an affiliation election] to cease bargaining" *unless* there is reason to challenge the union's majority status. *SeaFirst*, 475 U.S. at 209, 106 S.Ct. at 1016–1017. " 'To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to [industrial peace].' " *Id.* (citations omitted). On the other hand, in certain factual situations, failure to follow the union's internal rules could be relevant to the ultimate issue of whether there is a "representation question." If the deviation from the rules were such as to prevent the vote from reflecting the will of the members, then this would be a serious flaw in the election.

Minn–Dak makes such an argument. According to Minn–Dak, the bylaws' requirement of a "majority vote of Association members" meant that more than half the total membership must have voted in favor of the affiliation, regardless of the number who voted against it. Therefore, a member who opposed the affiliation could either vote against it or refuse to vote at all, with exactly the same effect of helping to prevent the proposition from gaining the requisite number of votes. From this, Minn–Dak argues that all those who did not vote may have intended their failure to vote to function as a vote against affiliation, and that the Association's violation of its rule thus effectively deprived those members of the chance to express their desires.

Although Minn–Dak's argument has some plausibility, several factors make the possibility of real unfairness very remote. First, and most important, Minn–Dak has not produced any evidence that anyone was actually misled. Second, the import of the bylaw Minn–Dak relies on is not as clear as Minn–Dak claims. A reading of the bylaw by no means inspires a firm conviction that affiliation must be approved by a majority of all members, rather than a majority of members who voted. This ambiguity greatly undermines the possibility that anyone would stake

his franchise on a particular interpretation of the bylaw instead of just going to the meeting and voting. Third, there is real ground for confusion over whether the bylaws should be read to permit all unit employees to vote in the election, or only dues-paying members of the Association. At times Minn–Dak argues that all unit employees were "members," and thus, eligible to vote. However, language in the bylaws seems to limit voting eligibility to dues-paying members, rather than including all unit employees. *See* Bylaws, Ch. 1, §§ 1–2. Minn–Dak itself espouses such a reading of the bylaws when it argues that the Association failed to segregate votes of "members and non-members," thus implying that some of the Minn–Dak employees who voted were not actually members of the Association. If the bylaws truly permit only dues-paying members to vote, then seventy-seven of the seventy-eight eligible members voted in the affiliation election, and Minn–Dak's argument about abstaining to vote "no" could only apply to one person. Even if the bylaws should be read to permit all unit employees to vote, the whole issue is so ambiguous and perplexing that it is unlikely that non-dues-paying employees would have been misled into staying home when they wanted to oppose affiliation.

In sum, although Minn–Dak has patched together a theoretical objection to the election, there is no evidence that the workers were actually prevented from expressing their wishes, which is the point of the NLRB due process test.

■ Minn–Dak next argues that the AFGM constitution gives it such power over governance of the Local that the resulting Local lacks substantial continuity with the old Association. Minn–Dak specifically points to powers the AFGM constitution gives the AFGM over bargaining, decisions to strike, bylaw changes, and grievance procedures.

■ In deciding whether changes following affiliation were "sufficiently dramatic to alter the union's identity," *SeaFirst*, 475

*NLRB*, 244 F.2d 672 (6th Cir.1957). As the NLRB pointed out, slip op. at 4 n. 4, in these cases the NLRB merely noted with approval that

the unions had followed their constitutional procedures.

U.S. at 206, 106 S.Ct. at 1015, the NLRB considers the "totality of a situation." *May Dep't Stores*, 897 F.2d at 228. As the party seeking to displace the employer-bargaining representative relationship, Minn–Dak has the burden of proving discontinuity. *News/ Sun Sentinel Co. v. NLRB*, 890 F.2d 430, 432 (D.C.Cir.1989), *cert. denied*, 497 U.S. 1003, 110 S.Ct. 3238, 111 L.Ed.2d 748 (1990). Relevant factors include comparison of the membership and leadership before and after the affiliation; the effect on membership rights and duties; and the effect of affiliation on the procedures for contract negotiations, administration and grievance processing. *See, e.g., May Dep't Stores*, 897 F.2d at 228–29; *Seattle–First*, 892 F.2d at 799–801.

In this case, the union membership both before and after the affiliation are all employees of Minn–Dak, and the leadership is virtually the same (with the exception of one former officer who was replaced). These two factors weigh heavily in favor of a finding of continuity and distinguish it from situations in which continuity was missing. *See Seattle–First*, 892 F.2d at 799, 801 (distinguishing case where independent union "swallowed up by another local" on affiliation); *cf. St. Vincent Hosp. v. NLRB*, 621 F.2d 1054, 1057 (10th Cir.1980) (continuity where officers the same); *Retail Store Employees Union, Local 428 v. NLRB*, 528 F.2d 1225, 1228 (9th Cir.1975) (no continuity where officers changed).

Minn–Dak points to several provisions of the AFGM Constitution which Minn–Dak claims gave the international union inordinate control over the Local. We have reviewed each of these provisions. Since we conclude that, taken in the aggregate, they do not work significant changes in the Local's identity, we consider it unnecessary to discuss the provisions individually.

We deny Minn–Dak's petition and grant the NLRB's cross-petition.