# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 97-2988/3217

_____

| | | |
|---|---|---|
| Sioux City Foundry Company, | * | |
| | * | |
| Petitioner, | * | On Petition for Review of an Order of |
| | * | The National Labor Relations Board. |
| v. | * | |
| | * | |
| National Labor Relations Board, | * | |
| | * | |
| Respondent. | * | |
| | * | |

_____

Submitted: February 9, 1998
Filed: September 3, 1998

_____

Before RICHARD S. ARNOLD,[1] Chief Judge, HANSEN, Circuit Judge, and LIMBAUGH,[2] District Judge.

_____

HANSEN, Circuit Judge.

_____

[1]The Honorable Richard S. Arnold stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on April 17, 1998. He has been succeeded by the Honorable Pasco M. Bowman, II.

[2]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri, sitting by designation.

The Sioux City Foundry Company (the Company) petitions for review of the National Labor Relations Board's (NLRB) order ruling that it had committed various violations of section 8 of the National Labor Relations Act (the Act), see 29 U.S.C. § 158 (1994), and requiring that it recognize and, on request, bargain with the International Association of Machinists and Aerospace Workers, AFL-CIO, Local Lodge No. 1426 (IAM). The NLRB has filed a cross petition for enforcement of the order. This case arises from events surrounding the affiliation of an independent union representing employees of the Company with the IAM and the Company's subsequent refusal to bargain with the IAM. The Company makes numerous claims on appeal, including that the affiliation was improper, that its actions were lawful under the Act, and that some of the unfair labor practices charges were time-barred. We deny the Company's petition for review and grant enforcement of the NLRB's order.

I.  Factual and Procedural Background

The Company operates two plants, one in Sioux City, Iowa (Plant 1), and another in South Sioux City, Nebraska (Plant 2). At Plant 1, the Company conducts structural steel fabrication, contract steel manufacturing, and rebar operations. The Company manufactures cast iron products at Plant 2. In 1994, the Company had approximately 135 total employees—75 at Plant 1 and 60 at Plant 2. Employees at both plants were represented by the United Molders Union until 1986, when they then began being represented by the Sioux City Foundry Company Shop Committee (the Shop Committee), an independent union. The Company and Shop Committee negotiated a number of collective bargaining contracts covering employees at each plant. Employees at each plant elected their own Shop Committee representatives to deal with the Company regarding day-to-day matters.

During 1994 some employees began seeking more effective union representation. On October 6, 1994, six employees met with three officials of the IAM concerning the possibility of affiliating with the IAM. These employees agreed that the Shop

Committee should consider affiliating with the IAM. The Shop Committee then scheduled an affiliation meeting and vote for Sunday, October 30, 1994.

Ronald Clingenpeel, the Shop Committee president, asked the Company for the names and addresses of all the bargaining unit employees. Andrew Galinsky, the Company's president and chief executive officer, replied that it was not the Company's policy to provide this information and that the Shop Committee officers would have to obtain this information on their own. Thus, Shop Committee officials informed Plant 2 workers of the affiliation meeting and vote orally and by posting notices at the plant. At an October 17 all-employee meeting, Company president Galinsky explained his opposition to the proposed affiliation with the IAM. Subsequently, employees and IAM officials hand-distributed about 60 notices of the affiliation meeting and vote outside Plant 1 on two different occasions. Apparently, some notices were also handed out at Plant 2, although the extent of this hand billing is unclear from the record.

On October 28, 1994, Company president Galinsky approached Clingenpeel at work and told him that if arbitration was the employees' main concern underlying their desire to affiliate with the IAM, he would amend the existing collective bargaining contract to state that the Company would pay the costs of grievance arbitration. He also warned Clingenpeel that if the Shop Committee affiliated with the IAM, he would cease personally negotiating the collective bargaining contracts and instead use a third party.

The affiliation meeting and vote took place as scheduled on October 30, 1994, with 24 employees attending, only two of whom worked at Plant 1. IAM officials at the meeting informed the employees in attendance about the specific consequences of an affiliation with the IAM, including that the IAM had an international constitution that would bind the affiliation, and that bylaws existed for the IAM and local lodge. However, neither the constitution nor bylaws were provided for the employees to review at the meeting. An affiliation agreement, which had been prepared before the

meeting, was read to the employees. The IAM officials also answered employee questions.

Shortly before 4:00 p.m. the IAM officials left the meeting, and following a brief discussion, the employees decided to proceed with the affiliation vote. Secret ballot voting then commenced. The polls remained open until 5:00 p.m., as the notices concerning the affiliation meeting had specified, although the only votes cast were by the 24 employees already in attendance. The vote was 22 to 2 in favor of affiliation. The IAM officials then returned to the meeting and two IAM representatives and three Shop Committee officers signed the affiliation agreement. No Shop Committee representatives from Plant 1 signed the agreement because none had attended the affiliation meeting. The IAM sent a letter to one Plant 2 employee congratulating the employees on the affiliation, and he posted the letter on the bulletin board at Plant 2. No employees protested the Shop Committee's affiliation with the IAM. The IAM later demanded that the Company recognize it as the employees' exclusive bargaining representative, but the Company refused.

In October 1995, Galinsky assumed ownership of Continental Rebar (Continental), a firm previously owned by his wife. Continental conducts rebar operations at Plant 1. Although Continental's employees work at Plant 1, they use a separate entrance to the plant, have minimal contact with the Company's employees and, during the relevant time period, had their own independent union, the Continental Committee, representing them.

On October 31, 1995, Galinsky met with the president of the Shop Committee and a member of the Continental Committee. Galinsky told them that he wanted them to merge the two committees so that he could negotiate one contract with both the Continental and Company employees. He gave the two employees proposed letters signed by him and addressed to their respective committees requesting that negotiations for a new contract begin at a later date than those specified in the existing collective

bargaining contracts. He also gave each a separate document stating that the two committees agreed to merge and that the merged shop committee would appear as an alternative on any ballot used for voting on union representation. Both employees signed the letters and merger document, although the Company's employees never voted on the merger.

In December 1995, the Company had three negotiating sessions with the merged shop committee. On December 21, 1995, the parties reached an agreement and executed a new collective bargaining contract for a term of January 1, 1996, to December 31, 1998. Several employees from both Plant 1 and Plant 2, as well as employees of Continental, signed the contract as representatives of the merged shop committee. The Company did not contact the IAM concerning the merger of the two committees or the negotiation and execution of the new collective bargaining contract.

IAM filed an unfair labor practices charge with the NLRB on December 13, 1994, which was amended on January 31, 1995, alleging violations of the Act arising from the Company's refusal to recognize the affiliation with the IAM and Galinsky's offer to pay arbitration costs. The IAM filed a second unfair labor practices charge with the NLRB on November 8, 1995, which was amended on January 17, 1996, alleging violations of the Act arising from the merger of committees and the Company's negotiation and execution of a collective bargaining contract with the merged shop committee.

The first unfair labor practices charge, filed on December 13, 1994, was initially dismissed by the Regional Director of the NLRB on March 16, 1995. This dismissal was appealed by the IAM to the General Counsel. That appeal was still pending when the second unfair labor practice charge was filed by the IAM on November 8, 1995. In a letter dated January 22, 1996, the Regional Director partially revoked his dismissal as to some allegations in the first charge. Nine days later, the NLRB issued an order consolidating the first and second charges into one case.

The consolidated case was heard by an Administrative Law Judge (ALJ). After considering the facts outlined above, the ALJ denied the Company's motion to dismiss allegations in the first charge, ruling that they were not time-barred. The ALJ further ruled that: (1) the affiliation of the Shop Committee and the IAM was proper; (2) the Company unlawfully refused to recognize the IAM as the bargaining agent of the employees; (3) the Company unlawfully initiated the merger of the two shop committees; (4) the Company unlawfully recognized, bargained with, and executed a collective bargaining contract with the merged shop committee; and (5) the Company made unlawful promises to pay for arbitration costs prior to the affiliation vote. The ALJ entered an order requiring the Company to recognize and, on request, to bargain with the IAM. The Company appealed and on June 24, 1997, the NLRB affirmed the ALJ's findings, ruling, and order.[3] The Company petitions for review, and the NLRB cross petitions for enforcement of the order.

## II. Analysis

The Company makes four arguments for reversal of the NLRB's order. It claims the NLRB erred in: (1) denying its motion to dismiss the allegations in the first unfair labor practice charge as time barred; (2) concluding that the affiliation of the Shop Committee with the IAM was proper; (3) ruling that the Company violated the Act by initiating the merger of the two shop committees; and (4) ruling that the Company violated the Act by making promises to pay arbitration costs prior to the affiliation vote.

In reviewing the NLRB's order, we give "great deference" to the NLRB's affirmation of the ALJ's findings. Pace Indus., Inc. v. NLRB, 118 F.3d 585, 590 (8th Cir. 1997) (internal quotation omitted), cert. denied, 118 S. Ct. 1299 (1998). We will enforce the NLRB's order if the NLRB has "correctly applied the law and its factual

---

[3]The NLRB did make a minor modification to the ALJ's order that is not relevant to this petition for review.

findings are supported by substantial evidence on the record as a whole, even if we might have reached a different decision had the matter been before us de novo." Id. (internal quotation omitted).

## A. The Motion to Dismiss

The Company first claims that its motion to dismiss should have been granted because the allegations made in the first unfair labor practices charge were time-barred under section 10(b) of the Act, 29 U.S.C. § 160(b). The Company concedes that the second unfair labor practices charge was timely. Section 10(b) of the Act provides "[t]hat no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board . . . ." 29 U.S.C. § 160(b). The Company argues that the NLRB violated this section when it considered allegations from the first charge that had been reinstated by the Regional Director more than six months after the allegations had occurred, citing Ducane Heating Corp., 273 N.L.R.B. 1389 (1985), enforced per mem., 785 F.2d 304 (4th Cir. 1986), and enforced sub nom. International Union of Elec. Workers, 785 F.2d 305 (4th Cir. 1986). We disagree.

In Ducane Heating, the Regional Director dismissed a charge and no appeal was filed. The Regional Director then sua sponte reinstated the dismissed charge more than nine months after it had been filed. The NLRB stated that when a charge is dismissed and such dismissal is not appealed, "the charge has been disposed of and, in effect, ceases to exist." Ducane Heating, 273 N.L.R.B. at 1391. Thus, absent fraudulent concealment or some other basis for equitably tolling the six month period, the NLRB ruled that the disposed charge cannot be reinstated more than six months after the allegations occurred. Id.

The Ducane Heating rule does not apply here. In this case, the IAM had appealed the dismissal of the first charge to the General Counsel and this appeal was

pending when the Regional Director reinstated some of the allegations from the charge. Unlike in <u>Ducane Heating</u>, the charge had not been finally resolved because of the pending appeal. <u>See</u> <u>Redd-I, Inc.</u>, 290 N.L.R.B. 1115, 1118 (1988) ("When there is a pending timely charge on file, however, [the charged party] has no right to assume his liability is extinguished . . . ."). The General Counsel could have reinstated the allegations from the first charge on appeal, and we see no reason why the NLRB cannot delegate this authority to allow the Regional Director, <u>sua sponte</u>, to reinstate those same allegations.

We also reject the Company's argument that because rules in the NLRB's casehandling manual are inconsistent with the ALJ's reinstatement of these allegations we must reverse the NLRB's denial of the Company's motion to dismiss. The casehandling manual is not binding on this court or the NLRB. <u>See</u> <u>Children's Nat'l Med. Ctr.</u>, 322 N.L.R.B. 205, 205 n.1 (1996). The NLRB did not err in denying the Company's motion to dismiss.

## B. The Affiliation

Section 8(a)(5) of the Act makes it unlawful for an employer "to refuse to bargain collectively with the representatives of his employees," subject only to exceptions not applicable in this case. 29 U.S.C. § 158(a)(5). Section 7 and 8(a)(1) of the Act make it unlawful for an employer "to interfere with . . . employees in the exercise of the rights guaranteed" under the Act, including the right "to bargain collectively through representatives of their own choosing." 29 U.S.C. §§ 157, 158(a)(1). Because the NLRB found that the affiliation between the Shop Committee and the IAM was proper, it ruled that the Company violated the Act by refusing to recognize and to bargain with the IAM, and it ordered the Company to recognize and, on request, to bargain with the IAM.

The Company argues that the affiliation between the Shop Committee and the IAM was improper and therefore that it did not violate the Act by negotiating and executing the new collective bargaining contract with the merged shop committees rather than the IAM. When a union affiliates with another union it raises the issue of whether there is a "question of representation," which occurs when "it is unclear whether a majority of employees continue to support the reorganized union." NLRB v. Financial Inst. Employees, 475 U.S. 192, 202 (1986) (SeaFirst) (internal quotations omitted); Minn-Dak Farmers Co-op. v. NLRB, 32 F.3d 390, 393 (8th Cir. 1994). When a union desires to affiliate with another union an election is required and the NLRB makes two central findings to determine if the affiliation election was proper: (1) whether the affiliation election was conducted with adequate due process safeguards; and (2) whether there is "substantial continuity" between the pre- and post-affiliation unions. SeaFirst, 475 U.S. at 198-99; May Dep't Stores Co. v. NLRB, 897 F.2d 221, 225-26 & n.6 (7th Cir.), cert. denied, 498 U.S. 895 (1990).

In this case, the NLRB found that due process safeguards were met and there was substantial continuity between the Shop Committee and the IAM. The Company attacks both of these findings. The NLRB's findings are "entitled to deference if supported by substantial evidence on the record as a whole." Minn-Dak, 32 F.3d at 393. In reviewing these findings, we are cognizant of the Supreme Court's observation in SeaFirst that "allow[ing] employers to rely on employees' rights in refusing to bargain with" a newly affiliated union "is not conducive to industrial peace." 475 U.S. at 209 (internal quotation and alteration omitted).

1. Due Process

We first address the Company's argument that the affiliation election lacked minimal due process safeguards. The Company claims that the notice of the affiliation election was inadequate. Minimal standards of due process require that notice of the affiliation election be given to the union members. SeaFirst, 475 U.S. at 199. The

employer has the burden of proving that due process was not satisfied. <u>Sullivan Bros. Printers, Inc. v. NLRB</u>, 99 F.3d 1217, 1222 (1st Cir. 1996).

The record shows that a notice of the affiliation meeting and election was continuously posted on the Plant 2 bulletin board for 23 days prior to the election—from October 7 until the vote on October 30. A second notice was posted at Plant 2 a week prior to the election. It was certainly reasonable for the NLRB to find that all the employees at Plant 2 had notice of the affiliation election. Also, at the all-employee meeting 13 days prior to the affiliation vote, Company president Galinsky expressed opposition to the Shop Committee affiliating with another union. Further, the record shows that about 60 notices were distributed to employees outside of Plant 1 during shift changes on October 24 and 27. (Jt. App. at 173, 244.) The evidence shows that some employees refused the notices, and there is nothing in the record to suggest that any of the handbillers refused to give notices to any employees. A reasonable inference may be drawn from this hand billing, as well as from Galinsky's comments at the all-employee meeting, that the vast majority of employees at Plant 1 also had notice of the meeting. Although the notice of the affiliation election provided to the employees in this case was less than ideal, our review of the record as a whole convinces us that the NLRB's finding that the notice of the affiliation election satisfied minimal due process standards is supported by substantial evidence.[4]

The Company also claims that there was an inadequate opportunity for the employees to discuss the proposed affiliation prior to voting. Minimal standards of due process require that "an adequate opportunity for members to discuss the [affiliation]

---

[4]Although it does not affect our analysis, we note that Clingenpeel asked the Company for the addresses of all the employees more than three weeks before the affiliation vote and his request was denied. It appears that all employees would have received mailed notice of the election if the Company had simply provided the addresses, thus eliminating the need for the Company to argue that the union denied the employees their rights to notice of the affiliation vote.

-10-

election" be provided and that "reasonable precautions to maintain ballot secrecy" be taken. SeaFirst, 475 U.S. at 199. The Company concedes that ballot secrecy was maintained.

After reviewing the record as a whole, we are satisfied that the NLRB's finding that the employees were provided an adequate opportunity to discuss the proposed affiliation is supported by substantial evidence. The record shows that the proposed affiliation agreement was read verbatim to the employees at the affiliation meeting prior to the vote. The employees were told that the current collective bargaining contract would remain in force until its expiration. The employees were also informed that they would elect their own negotiating committee and have full control over negotiations and that the IAM would only intervene and provide assistance if the negotiators requested such help. The IAM officials explained to the employees that the IAM had a constitution and that the local and district lodges had bylaws, all of which would be binding on the members. Although the Company relies heavily on the fact that the IAM's constitution and local and district lodge bylaws were not provided for employee inspection at the meeting, that does not require us to overturn the NLRB's finding that sufficient opportunity to discuss the proposed affiliation was provided. The IAM officials explained the $20 per month dues, the right not to join and to pay this as a service fee, and the right not to pay the dues or fees and the IAM would still be required by law to represent the employees. All employee questions were also answered at the meeting. Finally, we deem it significant that no employee has objected to either the procedures used to discuss the affiliation or to the affiliation itself.

## 2. Substantial Continuity

We next address the Company's argument that the affiliation lacks substantial continuity. There is a lack of substantial continuity between the pre- and post-affiliation organizations if there are changes "sufficiently dramatic to alter the union's identity" such that it raises a question of representation. SeaFirst, 475 U.S. at 206. In

making this determination, the NLRB and this court consider the totality of the situation, including such relevant factors as: "comparison of the membership and leadership before and after the affiliation; the effect on membership rights and duties; and the effect of affiliation on the procedures for contract negotiations, administration and grievance processing." Minn-Dak, 32 F.3d 395. The employer has the burden of proving that the affiliation lacks substantial continuity. Id.

Our review leads us to conclude that the NLRB's finding that substantial continuity existed after the affiliation is supported by substantial evidence in the record as a whole. Although the IAM's local lodge alone has between 600 and 800 members, far more members than were in the independent Shop Committee prior to the affiliation, the evidence supports the NLRB's finding that the employees have retained control over much of the union's operation. An increase in the number of members alone cannot prove a lack of substantial continuity. See May Dep't Stores, 897 F.2d at 229 n. 9. The record shows that the employees held an election shortly after the affiliation and three officials were retained and one was replaced. These leaders were elected by the employees themselves without any outside involvement. Further, the employees retained the right to elect their own negotiating teams for collective bargaining. The IAM would only assist if requested by the negotiating team. The employees also retained the right to decide whether to accept contract proposals. Regarding grievances, the testimony before the ALJ was that the local employees' leaders would have control over whether to take a particular grievance to arbitration and IAM officials would only become involved in the process if requested. The employees also continued to have the right to choose whether or not to pay dues because both Plant 1 and Plant 2 are in "right-to-work" states and, therefore, no employees could be forced to pay dues or fees to the IAM. This evidence provides adequate support for the ALJ's finding that the employees had significant control over negotiation, grievances, and leadership, both before and after affiliation, sufficient to show substantial continuity.

## C. Merger of the Shop Committees

Section 8(a)(2) of the Act prohibits employers from interfering with "the formation or administration of any labor organization." 29 U.S.C. § 158(a)(2). Sections 7 and 8(a)(1) of the Act prohibit an employer from interfering with "employees in the exercise of their rights guaranteed" under the Act, including the right "to bargain collectively through representatives of their own choosing." 29 U.S.C. §§ 157, 158(a)(1). The NLRB ruled that the Company violated these sections by initiating the merger of the Shop Committee and the Continental Committee, and by negotiating and entering into a collective bargaining contract with the merged shop committee. The Company argues that the NLRB's ruling is erroneous because the Continental Committee has never been a separate bargaining unit, and therefore the Company did not violate the Act when it merged the two committees. We reject this argument because the NLRB's finding that the Continental Committee was a separate bargaining unit when it merged with the Shop Committee is supported by substantial evidence on the record as a whole.

Before Company president Galinsky acquired Continental from his wife, Continental employees had been represented by their own shop committee, the Continental Committee. The Continental employees had their own collective bargaining contract with Continental, separate from the Company's employees. There is no evidence to show that after Galinsky acquired Continental there were any changes that would destroy the identity or viability of the Continental Committee as a separate bargaining unit. The merger agreement itself, drafted by the Company, calls for the merger of "the shop committees of both [the Company] and Continental." (Jt. App. at 301.) Further, the admitted purpose of the merger was to allow bargaining for one contract instead of two. It is clear that the Company itself viewed the Continental Committee as a separate bargaining unit. The NLRB's finding that the Continental employees were represented by a bargaining unit separate from the bargaining unit

-13-

representing the Company's employees is supported by substantial evidence on the record as a whole.

### D. Offer to Pay Arbitration Costs

An employer violates § 8(a)(1) of the Act by offering employees benefits conditioned on their selection or rejection of a bargaining representative. NLRB v. Spotlight Co., 462 F.2d 18, 20 (8th Cir. 1972). The NLRB ruled that the Company violated § 8(a)(1) of the Act when, shortly before the affiliation election in October 1994, Company president Galinsky offered to pay the Shop Committee's arbitration costs. The NLRB found that Galinsky offered to pay these arbitration costs in an attempt to influence the employees to vote against affiliating with the IAM. The Company argues that this finding is "factually inaccurate" because Galinsky was "simply reiterating an offer which he had made to [Shop Committee] representatives on previous occasions." (Appellant's Br. at 32.) We disagree.

The record shows that in October 1994, shortly before the affiliation election, Galinsky told Clingenpeel that if arbitration was the employees' main concern underlying their desire to affiliate with the IAM, he would amend the existing collective bargaining contract to state that the Company would pay the costs of grievance arbitration. He also warned Clingenpeel that if the Shop Committee affiliated with the IAM, he would cease personally negotiating the collective bargaining contracts and instead use a third party. We agree with the ALJ that these latter comments conveyed a "natural meaning" that negotiations would become more difficult if the Shop Committee affiliated with the IAM. (Jt. App. at 57.) The ALJ also considered the fact that Galinsky had made promises to pay arbitration costs in the past, but found that the promises in October 1995 were meant to influence the affiliation election. Our review of the record as a whole convinces us that substantial evidence supports the NLRB's finding that Galinsky's promises to pay arbitration costs were meant to influence the

affiliation election in violation of the employees' statutory right to determine their bargaining representative without employer interference.

## III. Conclusion

We have considered and rejected all of the Company's arguments in its petition for review.  Accordingly, we deny the petition for review and grant the NLRB's cross petition for enforcement of the order.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT